HENRY A. LINK ET AL. PLAINTIFFS AND RESPONDENT, *v.* THE STATE OF MONTANA, ACTING BY AND THROUGH THE DEPARTMENT OF FISH AND GAME, ET AL. DEFENDANTS AND APPELLANTS.

No. 14086.
Submitted Sept. 20, 1978.
Decided Feb. 28, 1979.
591 P.2d 214.

Frank B. Morrison, Jr. argued and Daniel O. Kemmis argued, Missoula, for defendants and appellants.

Hutton & Cromley, Billings, Brent R. Cromley argued, Billings, for plaintiffs and respondents.

JACK D. SHANSTROM, District Judge, sitting for MR. JUSTICE SHEEHY, delivered the opinion of the Court.

Plaintiffs brought this action in the District Court of the First Judicial District, Lewis and Clark County, alleging breech of contract and praying for relief in the form of damages and specific performance. Defendants counterclaimed, alleging default on a condition of the contract and praying that the contract be declared terminated. The District Court on November 4, 1976, issued a partial summary judgment declaring defendants to be in breach of the contract, and on October 3, 1977, issued a final summary judgment ordering specific performance of the contract. This is an appeal from the partial summary judgment of November 4, 1976, and the final summary judgment of October 26, 1977.

Since this is an appeal from a summary judgment, there is no transcript. Therefore, the record in this case consists of the District Court file in Cause No. 40212 from the First Judicial District, in and for the County of Lewis and Clark, State of Montana; the District Court file in Cause No. 35029 of the same court, an earlier case involving the same parties and the same subject in which the judgment had become final; the depositions taken in the above-mentioned cases; the answers to interrogatories in the above-mentioned cases; and the affidavits.

The facts are as follows: On June 15, 1946, after extensive negotiations, the Montana State Park Commission entered into an agreement with Henry A. Link, John G. Link, Jr., Elmer F. Link and Lousi W. Link, a copartnership doing business as Link Bros. (defendants herein and hereinafter referred to as "concessionaires"). This agreement gave concessionaires the right to operate concessions at Lewis and Clark Caverns State Park in return for payment to the State of 10 percent of the gross receipts from the concessions. The concessionaires also agreed to construct certain permanent improvements on the premises, including buildings, booths and storerooms, a water system, and possibly a mountain railroad. All such improvements were to become the property of the Park Commission upon construction and were to be leased to concessionaires. The agreement had a life of 25 years, and concessionaires had an option to renew.

Concessionaires did construct a system to transport visitors between the concession area and the cavern entrances. This system, which came to be called a "mountain railroad", consisted of two components. Visitors were carried back and forth between the concession area and the lower cavern entrance in a sight-seeing car pulled on railroad tracks by a Jeep. A hoist and tram lifted the visitors approximately 300 feet at a 30 degree incline from the lower to the upper cave entrance. Visitors walked through the cave from the upper to the lower entrance. Concessionaires operated this railroad from 1947 to 1950.

On March 30, 1950, the Park Commission and concessionaires signed a supplemental agreement whereby the Commission agreed to "take over the operation and maintenance of the said mountain railroad", and to "operate and maintain same at its own expense". The "equity of said Concessionaires in the business of said mountain railroad"- was to be "recognized" by payments to the concessionaires of a certain percentage of the railroad fare. That fare was to be charged to all visitors "whether or not said mountain railroad was in operation, except when said mountain railroad is shut down for repairs or for other reasons beyond the control fo the Commismion."

In 1953 the duties of the State Park Commission were transferred to the State Highway Commission and in 1965 the administration of the state parks passed to the Fish and Game Commission making that body (hereinafter called the "Commission") the successor to the Park Commission's interest in the agreement as amended. In 1970, the concessionaires exercised their option to renew the amendment agreement for an additional 25 years.

In 1973 a large gear broke in the cable car hoist and was not replaced by the Commission. This caused the tramway portion of the system to be closed. The Commission made repairs to the other portions of the railroad from 1973 to 1975, but in 1976 the Commission refused to spend more money on the mountain railroad and discontinued its use. The track was removed, and a gravel pathway

was constructed from the concession area to the cavern entrance. Park visitors have used the pathway since that time.

The District Court, after hearing legal arguments and considering all the above-mentioned files, affidavits, interrogatories and other documents, ruled that no material issue of fact existed with respect to the contract and that plaintiffs had fully performed their obligations under the contract. The court, by partial summary judgment, found that defendants had breached the contract. Because the court found the determination of damages a speculative and inadequate remedy, it ordered specific performance of the contract whereby defendants must provide and maintain a workable mountain railroad and tramway system by June 30, 1979, operation of which is to be returned to concessionaires under the terms of the 1946 agreement.

Defendants present essentially four issues for our review:

1. Whether the District Court erred in finding that defendants breached the contract.

2. Whether defendants are obligated by the terms of the contract to replace the mountain railroad.

3. Whether defendants can be compelled to collect fares and remit a percentage to plaintiffs when the railroad is not operational.

4. Whether the District Court erred in ordering specific performance of the contract rather than awarding damages.

Defendants contend that the partial summary judgment should be reversed, first, because the contract was unenforceable for lack of consideration and therefore could not be breached. Second, they argue they had no duty to operate the railroad when the original system could no longer be maintained, that by abandoning the mountain railroad in 1976 and the tram in 1973 they did not breach the contract and that there would be an adequate remedy in damages and therefore no specific performance would be necessary.

We find the contract was fully supported by valuable consideration from the Links, and on this issue we determine there was

474

no material issue of fact and that the summary judgment was proper.

The 1946 contract provided, among other things, that the Links could build the mountain railroad. It further provided that if they did build the railroad, all improvements constructed by the Links were to become the property of the Park Commission upon their completion and were to be leased by the Commission to the concessionaires. This agreement had a life of 25 years, and the concessionaires had an option to renew the contract for an additional 25 years. The concessionaires constructed the mountain railroad at their own expense, and under the terms of the 1946 contract, the concessionaires operated the railroad, collected all of the fares and remitted to the State under the terms of the contract 10 percent of the gross income therefrom.

In 1950 the Commission requested that the 1946 contract be amended as the State wanted to take over the operation of the railroad. Accordingly the supplemental agreement of March 30, 1950, was executed. The new agreement provided:

"The Commission hereby agrees to take over the operation and maintenance of the said mountain railroad, also known and designated as a hoist and tramway, at Lewis and Clark State Caverns Park, Montana, as of January 1, 1950, and to operate and maintain same at its own expense. The equity of said Concessionaires in the business of said mountain railroad as provided in said agreement of June 15, 1946, shall be recognized by the payments to the Concessionaires by said Commission of the following amounts: "Sixty-five (65%) percent of the thirty (30¢) cent railroad fare which fare rate shall be charged to each adult . . . ". . . forty (40%) percent of the thirty (30¢) cent railroad fare which fare shall be charged to each child . . .

". . .

"Said Commission further agrees to operate said mountain railroad, tram and hoist, and handle the visiting public thereon in such a way as to encourage said public to use the other facilities of the Concessionaires at said Lewis and Clark Caverns State Park, and to

operate said railroad in a manner that is beneficial to the business of the Concessionaires . . ."

The concessionaires operated the railroad under the conditions set out in the contract of 1950, collected the fares and remitted to the State 10 percent of the gross income therefrom. In lieu of that right, the State took over the operation of the railroad, with the right to collect the total fare, subject only to paying concessionaires the sum of 19½ᶜ for each adult and 12ᶜ for each child. That kind of consideration is so obvious as to not need further explanation.

Judge W. W. Lessley, in the findings of fact on November 19, 1971, Cause No. 35029, paragraph 5, determined that:

"A. It was the mutual desire of the parties to charge the provisions of the agreement of June 15, 1946 with respect to the mountain railroad and the hoist and tramway.

"B. The parties recognized that the mountain railroad was owned by the commission.

"C. The defendants as concessionaires released the state from further reimbursement for or payment of the cost of constructing the mountain railroad.

"D. The concessionaires relinquished to the State their contractual right to operate the mountain railroad under the provisions of the agreement of June 15, 1946.

"E. The State agreed to take over the operation and maintenance of the mountain railroad and to operate and maintain the same at its own expense.

"F. The Equity of the concessionaires (defendants) in the mountain railroad was to be recognized by the payment to the concessionaires by the state of the following:

"65% of a 30ᶜ railroad fare charged to each adult visiting Lewis and Clark Caverns whether or not said mountain railroad is in operation except when the mountain railroad is shut down for repairs or for other reasons beyond the control of the commission:

"40% of a 30ᶜ railroad fare charged to each child visiting the Lewis and Clark Cavern, whether or not said mountain railroad is

476

in operation, except when the mountain railroad is shut down for repairs for other reasons beyond the control of the commission.

"G. The concessionaires further agreed to maintain and have ready for use at all times such fire fighting equipment as the commission may furnish and to comply with all fire prevention rules and regulations.

"H. Except as provided in the supplementary agreement, the agreement of June 15, 1946, was to remain in full force and effect."

Moreover, defendants are barred from such argument by res judicata. In Cause No. 35029 the District Court had already concluded that the agreements between the parties were valid, that they had been properly renewed, and that the equity of the concessionaires in the business of the railroad, which was contractually theirs from 1946 to 1950, was a valid consideration from them to the State for the payments agreed to be made by the State from and after March 30, 1950. "A judgment not appealed from is conclusive between the parties as to all issues raised by pleadings actually litigated and adjudged as shown on the face of the judgment and reasonably determined in order to reach the conclusion announced." *Butler v. Brownlee* (1969), 152 Mont. 453, 457, 451 P.2d 836, 838.

A decree of the court stands as an absolute finality "not merely as to the conclusion expressed, but as to everything directly or implicitly involved in reaching them." *Missoula Light & Water Co. v. Hughes* (1938), 106 Mont. 355, 366, 77 P.2d 1041, 1047; *Lokowich v. City of Helena* (1913), 46 Mont. 575, 581, 129 P. 1063, 1065. Whether viewed as res judicata or as collateral estoppel (see *Western Mont. Prod. Assn. v. Hydroponics* (1966), 147 Monta 157, 161, 410 P.2d 937, 939), the argument here of lack of consideration is barred. Defendants are seeking to open up an old argument which has been heretofore litigated, had no validity in the first action, and has no validity now.

The second issue of whether defendants are obligated by the terms of the contract to maintain and, if necessary, to replace the

railroad depends on the interpretation of the following language from the 1950 contract:

"The Commission hereby agrees to *take over the operation and maintenance* of the said mountain railroad, also known and designated as a hoist and tramway . . .*and to operate and maintain the same at its own expense* . . ."

"To 'maintain' means to preserve or keep in an existing state or condition and embraces acts of repair and other acts to prevent a decline, lapse, or cessation from that state of condition . . ." and ". . . includes the idea of keeping in repair, but has much broader meaning involving the concept of supporting, sustaining, carrying on and continuing." *State Farm Mutual Auto Insurance Co. v. Pan American Insurance Co.* (Texas 1969), 437 S.W.2d 542, 545.

The provision for payments in the contract reflected the intention of the parties that repairs to the equipment would be necessary. The agreement provides that the Department will pay the plaintiffs:

". . . Sixty-five (65%) percent of the thirty(30c) cent railroad fare, which fare rate shall be charged to each adult visiting Lewis and Clark Caverns, *whether or not said mountain railroad is in operation except when said mountain railroad is shut down for repairs or for other reasons beyond the control of the Commission.*"

*Defendants defaulted in their duty to repair the railroad bed, the railroad, and the tram and hoist. They had a duty to do so even in the face of changing governmental regulations. The District Court in its Finding of Fact No. 11, dated October 26, 1977, held:*

". . .The mountain railroad, tram and hoist have ceased to exist because of the refusal of the Department to operate and maintain the said railroad, hoist and equipment. The Court finds that it was the contemplation and intent of the parties at the time of entering into the contract that the mountain railroad, tram and hoist would be operated, repaired, replaced and restored for the full term of the concession contract and its renewal, and that unexpected expenses and difficulties claimed by the Department do not exclude performance on its part of the provisions of the contract."

Defendants' failure to maintain and refusal to operate the system is supported by the record, and there is no material issue of fact which must be submitted to the trier of the fact.

■ The third issue to be determined is whether defendants can be compelled to collect fares and remit a percentage to plaintiffs when the railroad is not operational. Defendants contend their duty to collect fares and remit a percentage to plaintiffs ended when the original system became inoperable. They further contend that any agreement to charge railroad fares whether or not the railroad is in operation should be rescinded as against public policy because it requires the State to charge people for services they do not receive.

Defendants' argument is contingent on finding they were under no duty to continue to operate the railroad because of its obsolescence. Furthermore, the public policy argument was presented to the District Court in the 1971 action and is subject to the same res judicata arguments which were set out previously in this case.

The contractual provision in question reads:

". . . The equity of said Concessionaires in the business of said mountain railroad . . . shall be recognized by the payments to the Concessionaires by said Commission of the following amounts:

"Sixty-five (65%) percent of the thirty (30ᶜ) cent railroad fare, which rate shall be charged to each adult visiting Lewis and Clark Cavern, whether or not said mountain railroad is in operation except when said mountain railroad is shut down for repairs or for other reasons *beyond the control of the Commission*." (Emphasis added.)

To find that defendants' duty to collect fares ended when the original system was taken out of operation, this Court would first have to find that the system's obsolescence was "beyond the control of the Commission." This we cannot do. All of the evidence submitted by way of affidavits, answers to interrogatories, depositions, and the District Court files in Cause Nos. 35029 and 40212 conclusively show that repairs, maintenance or replacement could have

been done by defendants. They refused to do so because of costs and not because of reasons beyond their control.

Thus, the contention that the Commission had no duty to operate the railroad longer than the original system would have lasted cannot be supported either in law or fact, and no material issue of fact existed on that point when the court entered its summary judgment for the concessionaires.

The last question to be determined by this Court is whether the District Court erred in ordering specific performance of the contract rather than awarding damages. Defendants contend that by ordering specific performance the court is put in the position of supervising a complex construction project and that such a decree cannot be precise enough to be enforceable. Furthermore, they contend that damages could be awarded by using attendance figures for the last several years and thereby estimating the damages to the concessionaires. Finally, they assert that specific performance would cost the State a minimum of $250,000 and therefore would operate more harshly on defendants than its refusal would operate on plaintiffs.

Plaintiffs have been put in the position that even if they could determine their past losses by the attendance figure, the loss of their future business because of the inconvenience to the patrons of Lewis and Clark Caverns by not having transportation to take them back and forth would be impossible to determine and denial of specific performance would operate more harshly on plaintiffs than granting it would on defendants. The District Court in Finding of Fact No. 42 said the reason for decreeing specific performance was because the damages were too speculative:

"Further, the Court, sitting as a court of equity, to achieve justice between the parties, finds it necessary in fact and in law to provide for specific performance on the part of the defendants to the extent necessary to provide a working or workable train, tram and hoist within the contemplation of the parties when contracting, to provide for restoration and restitution of the parties to their status quo under their first agreement, and to retain jurisdiction of the

parties in the cause to achieve the contractual results originally contemplated by the parties and to provide for payments to the plaintiffs until such time as the contractual objectives of the parties can be realized under the judgment of the Court."

The court elaborates further in its Conclusions of Law, letters K through O:

"K. The intent and disposition of the Department is not to perform its contractual obligations with respect to the maintenance and operation of the mountain railroad, tram and hoist. Because thereof the consideration for the execution by the concessionaire of the supplementary agreement, Exhibit B, has failed, without fault on the part of the plaintiffs.

"L. The contract here involved is unique, and pecuniary compensation to the plaintiffs for the non-performed by the defendants would not afford the plaintiffs adequate relief, and the plaintiffs have no plain, speedy or adequate remedy at law for the non-performance of the contractual agreements by the defendants.

"M. It is and would be extremely difficult to ascertain the actual damages sustained by the plaintiffs and caused by the non-performance of the contractual requirements that the defendants maintain and operate the mountain railroad, tram and hoist.

"N. It is proper that the Court, sitting in equity, require the Department to perform specifically its contractual obligations to maintain, repair and replace the mountain railroad, tram and hoist, at its expense, so as to meet all applicable, reasonable governmental regulations concerning such items of equipment.

"O. It is further proper that the Court, sitting in equity, require that the Department restore to the plaintiffs said mountain railroad, tram and hoist in fit condition to carry patrons to and from said caverns in the state park, and that the plaintiffs be allowed to operate and maintain the same, subject to the provisions of the original agreement, Exhibit A to the Complaint."

The defendants' "harsh" argument does not stand examination. A suitable case in example is that of *Portland Section of Council of Jewish Women v. Sisters of Charity of Providence in Oregon*

(1973), 266 Or. 488, 513 P.2d 1183. In that case the Oregon Supreme Court ordered the hospital to honor an agreement they had entered into in 1927, agreeing to care for a patient in the hospital for accomodations and services in *perpetuity*; and that by the year 1973 hospital costs and administration had increased so much that it would be unduly harsh for the hospital to have to honor the agreement. The Oregon Supreme Court disagreed and stated:

"The law in Oregon on discharge for practical impossibility because of unexpected difficulty or expense is set out in *Savage v. Peter Kiewit Son's Co.*, 249 Or. 147, 432 P.2d 519, 437 P.2d 487 (1968). The court there stated:

" 'In applying the doctrine of impossibility, courts recognize that unexpected difficulty or expense may approach such an extreme that a practical impossibility exists. See, e. g., Natus Corporation v. United States, 371 F.2d 450, 178 Ct.Cl. 1 (1967). To operate as a discharge, however, the hardship must be so extreme as to be outside any reasonable contemplation of the parties. Natus Corp. v. United States, supra.* (Emphasis added. Citations omitted.)

" 'Unexpected difficulties and expense, therefore, whether caused by injunction or by other causes, do not necessarily excuse performance of a contract. The question is whether the unforseen hazard [is] one that reasonably should have been guarded against. * * *' 249 Or. at 152-153, 432 P.2d 522." *Portland Section of Council of Jewish Women*, 513 P.2d at 1188.

Moreover, the Oregon court held that specific performance was the proper remedy saying:

"We hold that the trial court was correct in decreeing specific performance of the agreement. Even in 1927 it must have been contemplated by the parties that there was a distinct possibility that costs would not remain stable. It was necessarily evident that hospital care was, as it is now, and evolving science in which new treatment and techniques were being developed. Neither are we convinced that the contract presently is impossible of performance or so difficult to perform that equity should give relief therefrom. Defendant's gross receipts at the time of trial were at the rate of ap-

proximately $12,000,000 a year. We hold that the hazards of increasing expenses attributable to inflation and new techniques were ones that should and could have been guarded against and that the hardship has not become so extreme as to have been beyond any reasonable contemplation of the parties." *Portland Section of Council of Jewish Women*, 513 P.2d at 1188-89.

We agree with the Oregon court that specific performance is a proper remedy in this case, and that the concessionaires have faithfully performed their part of the concession contract. Two District Courts, in two separate trials, have so found. In a specific performance case, the District Court sits as a court of equity, and it is empowered to determine questions involved in the case and to do complete justice. *Hames v. City of Polson* (1950), 123 Mont. 469, 477, 215 P.2d 950, 955.

"The plaintiffs may not in equity insist upon the performance of the terms of the lease and at the same time prevent the performance thereof. One who prevents the performance of the terms of the nonperformance which he himself prevents. (Citations omitted.)" *Fey v. A. A. Oil Corp.* (1955), 129 Mont. 300, 319, 285 P.2d 578, 588.

The District Court in this case found that the Commission breached the contract in the past, was now breaching the contract, and intended in the future to breach its contractual obligations with the Links. It could only speculate as to the money damages that such breaches had caused in the past and would cause in the future. Loss of the mountain railroad has so completely changed the nature of plaintiff's operation that it would be impossible to establish a reasonable damage figure. The only just, reasonable and feasible solution was to compel specific performance and return the Links to the position they were in at the time the March 1950 contract was entered into, where the Links could run the railroad and the visiting public would again be served with transportation facilities to the mouth of the cave. All the court is ordering is that the Commission return to the Links what it had received: a working and operable railroad and tram system.

Defendants argue that the District Court was powerless to

grant specific performance because the District Court would then be engaged in continuous protracted supervision and direction with the requirement of special knowledge, skill and judgment. This is not so. A court sitting in equity has all of the power requisite to render justice between the parties, particularly where "the intent and disposition of the department is not to perform its contractual obligations." The District Court so found in its findings of fact and conclusions of law in Cause No. 40212, Conclusion of Law K.

The order of the District Court compelling specific performance of the contract is affirmed. The date by which performance is to be completed, however, is hereby changed to grant the State two years from the date of the issuance of this opinion in which to perform.

MR. CHIEF JUSTICE HASWELL and JUSTICES DALY, HARRISON and SHEA concur.