FILED

02/21/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0098

DA 16-0098

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2017 MT 30

ASSOCIATED DERMATOLOGY AND
SKIN CANCER CLINIC OF HELENA, P.C.
PROFIT SHARING PLAN AND TRUST FOR
THE BENEFIT OF STEPHEN D. BEHLMER, M.D.,

   Plaintiff and Appellant,

 v.

MOUNTAIN WEST FARM BUREAU
MUTUAL INSURANCE COMPANY,

   Defendant, Appellee,
   and Cross-Appellant.

APPEAL FROM: District Court of the First Judicial District,
      In and For the County of Lewis and Clark, Cause No. ADV 13-690
      Honorable Mike Menahan, Presiding Judge

COUNSEL OF RECORD:

   For Appellant:

      Erik B. Thueson, Thueson Law Ofice, Helena, Montana

      Scott Peterson, Morrison, Sherwood, Wilson and Deola, PLLP,
      Helena, Montana

   For Appellee:

      Randall G. Nelson, Nelson & Dahle, P.C., Billings, Montana

      Martha Sheehy, Sheehy Law Firm, Billings, Montana

         Submitted on Briefs: December 21, 2016

             Decided: February 21, 2017

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Appellant Associated Dermatology and Skin Cancer Clinic of Helena, P.C. Profit Sharing Plan and Trust for the Benefit of Stephen D. Behlmer, M.D. (Behlmer), appeals from the order of the First Judicial District Court, Lewis and Clark County, partially granting summary judgment to Appellee Mountain West Farm Bureau Mutual Insurance Company (Mountain West), holding that certain insurance proceeds must be deposited into the District Court, denying Behlmer's motion for attorneys' fees and costs, and not ruling on the availability of post-judgment interest. Mountain West cross-appeals the District Court's summary judgment ruling that determined the subject insurance policy provided coverage for Behlmer's claim. We address only the cross-appeal and reverse the District Court's coverage determination. We do not reach Behlmer's appellate issues.

¶2 We restate the issue as follows:

*Did the District Court err by holding there was coverage for the Corral Fire damage under Mountain West's commercial automobile policy?*

### FACTUAL AND PROCEDURAL BACKGROUND

¶3 Robert S. Fitte (Fitte) is a property owner in the Scratchgravel Hills in Lewis and Clark County, who runs a construction business out of his home. Fitte's property contained pine trees that had been killed by beetles. In June 2012, Fitte, concerned about potential damage that could occur if a tree fell, decided to cut down two beetle-killed pine trees on his property. Fitte was concerned that the trees might fall on his work vehicles, ladders, and scaffolding. He testified in his deposition:

> The tops of the trees had already blown over and damaged the fence in two spots. I was worried because that's where I park my work vehicles if the

3

tree itself blew over it would take out my work vehicles, and I keep ladders and scaffolds there from time to time when they're not on the job site.

¶4 On June 21, 2012, Fitte cut down the second tree, after felling the first tree earlier. Fitte trimmed the branches off the trees and cut the trunks into eight-foot logs, stacking them on his property with the intention of either selling or giving them away. Pursuant to a burn permit, Fitte started a fire to burn the branches from the trees so that the branches would not take up space on his property. He agreed in his deposition that, once he had felled both trees, there "was no longer a risk of those trees falling on [my] business vehicles or [my] scaffold or [my] ladders."

¶5 Two days later, a fire rose from the ashes of Fitte's burn and erupted into a wildfire that became known as the Corral Fire, as we have previously noted. *See Associated Dermatology & Skin Cancer Clinic of Helena, P.C. Profit Sharing Plan and Trust for the Benefit of Stephen D. Behlmer, M.D. v. Fitte*, 2016 MT 349, ¶ 3, 386 Mont. 150, ___ P.3d ___ [hereinafter *Associated Dermatology I*]. The Corral Fire burned over 1,800 acres owned by approximately 35 landowners, including Behlmer's 224-acre parcel, and consumed four dwellings, timber, and other personal property.

¶6 At the time of the fire, Fitte carried two insurance policies issued by Mountain West that provided three coverages: a $300,000 homeowners policy; and a commercial policy that provided $1,000,000 in coverage for commercial general liability (CGL) and

$500,000 in coverage for commercial automobiles. Only the commercial automobile coverage is at issue in this appeal.[1]

¶7   Fitte conceded negligence and, following arbitration on damages, stipulated to entry of a judgment in favor of Behlmer in the amount of $500,000, which was entered by the District Court on September 13, 2013. Fitte and Behlmer subsequently entered into an agreement in which Fitte assigned his rights in the Mountain West policies to Behlmer in exchange for an agreement that Behlmer would not execute against Fitte personally. Behlmer filed this action seeking, inter alia, a declaration that the automobile policy provided coverage for the Corral Fire damages and enforcement of its judgment against Fitte. Mountain West counterclaimed for a declaration that the automobile policy did not provide coverage. Both parties moved for summary judgment on the coverage issue and the District Court held in favor of Behlmer, reasoning that:

> By removing and disposing trees to prevent damage to his vehicles, Fitte caused the Corral Fire. Thus, [Behlmer's] property damage flowed from, grew out of, or originated from Fitte maintaining his insured vehicle.

(Internal quotations omitted).

¶8   Mountain West appeals.

### STANDARD OF REVIEW

¶9   This Court reviews a district court's order on a motion for summary judgment by applying the same criteria as the district court under M. R. Civ. P. 56. *Parker v. Safeco*

---

[1] Mountain West conceded coverage under the homeowners policy. Coverage under the CGL policy was declared by the United States District Court for the District of Montana. Order Granting Summary Judgment in Favor of Defendant and Intervenor Defendant, *Mountain W. Mut. Farm Bureau Mut. Ins. Co. v. Fitte* (D. Mont. 2013) (No. CV-13-20-RKS); *Associated Dermatology I*, ¶ 7.

5

*Ins. Co. of Am.*, 2016 MT 173, ¶ 15, 384 Mont. 125, 376 P.3d 114 (citing *Thornton v. Flathead Cnty.*, 2009 MT 367, ¶ 13, 353 Mont. 252, 220 P.3d 395).

¶10    The interpretation of an insurance policy presents a question of law, which we review for correctness. *Parker*, ¶ 14 (citing *Wendell v. State Farm Mut. Auto. Ins. Co.*, 1999 MT 17, ¶ 10, 293 Mont. 140, 974 P.2d 623); *State Farm Mut. Auto. Ins. Co. v. Ferrin*, 2002 MT 196, ¶ 11, 311 Mont. 155, 54 P.3d 21 (citing *Pablo v. Moore*, 2000 MT 48, ¶ 12, 298 Mont. 393, 995 P.2d 460).

## DISCUSSION

¶11    "It is well established that in construing and analyzing the terms of an insurance policy we look first to the policy's plain language." *Monroe v. Cogswell Agency*, 2010 MT 134, ¶ 15, 356 Mont. 417, 234 P.3d 79; *accord Lincoln Cnty. Port Auth. v. Allianz Global Risks US Ins. Co.*, 2013 MT 365, ¶ 15, 373 Mont. 60, 315 P.3d 934.   When interpreting the contract, we "give the terms and words used in an insurance contract their usual meaning and construe them using common sense." *Travelers Cas. & Sur. Co. v. Ribi Immunochem Research*, 2005 MT 50, ¶ 17, 326 Mont. 174, 108 P.3d 469; *accord Modroo v. Nationwide Mut. Fire Ins. Co.*, 2008 MT 275, ¶ 23, 345 Mont. 262, 191 P.3d 389; *Mitchell v. State Farm Ins. Co.*, 2003 MT 102, ¶ 26, 315 Mont. 281, 68 P.3d 703; *Stutzman v. Safeco Ins. Co. of Am.*, 284 Mont. 372, 376, 945 P.2d 32, 34 (1997).

¶12    Mountain West's commercial automobile policy provides, in pertinent part:

> We [Mountain West] will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto."

6

There is no dispute that the incident in question was an "accident" that caused "property damage" that the insured, Fitte, was legally required to pay. The coverage question here is whether the property damage "result[ed] from the ownership, maintenance or use of" Fitte's covered vehicles.

¶13 Mountain West's initial argument is that merely "preventing harm" to a vehicle by cutting down trees is not "maintenance" of a vehicle, but, rather, "maintenance" consists of "repairing or working on an intrinsic part" of a vehicle. Alternatively, Mountain West argues that, even assuming that maintenance could encompass the prevention of harm to a vehicle, Fitte's subsequent burning of the branches did not prevent any harm, but instead "dispos[ed] of rubbish which *at a previous time may* have posed a risk," adding that "any potential threat to the vehicles from the falling tree limbs ended when the trees were on the ground." (Emphasis in original.) As such, Mountain West argues that "Fitte did not burn the branches to eliminate a risk to his vehicles," and that the Corral Fire damages resulted from Fitte's decision about the method of *disposing* of the tree branches.

¶14 Behlmer responds that the policy provides coverage "because the Corral Fire and the damage it caused resulted from Fitte maintaining his insured vehicles." Behlmer argues that the District Court correctly reasoned that Fitte was engaging in "maintenance" because his actions were done "to preserve or keep [his insured vehicles] in an existing state or condition." Thus, Behlmer argues that "a causal relationship existed here between the fire and the vehicle's maintenance," because, quoting the District Court,

7

"[t]he obvious and necessary result of cutting down trees is the requirement to dispose of them."

¶15 We have once addressed the meaning of the word "maintenance," albeit in a non-insurance context. In *Link v. State*, 180 Mont. 469, 591 P.2d 214 (1979), cited by Behlmer, the Montana State Park Commission (Park Commission) entered into a contract in 1946 with the Link Bros. partnership that granted the partnership the right to operate the concession service at the Lewis and Clark Caverns State Park, and required that the partnership construct certain improvements that would become the property of the Park Commission, including a railroad or tramway to carry visitors from the concession area to the caverns. *Link*, 180 Mont. at 471, 591 P.2d at 216. Link Bros. operated the tramway for three years before entering into a supplemental agreement with the Park Commission in which the Park Commission agreed to "'take over the operation and maintenance of the said mountain railroad', and to 'operate and maintain same at its own expense.'" *Link*, 180 Mont. at 472, 591 P.2d at 216 (quoting the agreement). The Park Commission agreed to pay Link Bros. a portion of the fares in recognition of their investment in the improvements. *Link*, 180 Mont. at 472, 591 P.2d at 216. In 1973, a gear in the tramway hoist broke and the Park Commission did not repair it, but instead removed the tramway and replaced it with a walking path in its place. *Link*, 180 Mont. at 472–73, 591 P.2d at 217. Addressing Link Bros.' breach of contract claim, we quoted the Texas Supreme Court, stating:

> "To 'maintain' means to preserve or keep in an existing state or condition and embraces acts of repair and other acts to prevent a decline, lapse, or cessation from that state of condition . . ." and ". . . includes the idea of

8

keeping in repair, but has much broader meaning involving the concept of supporting, sustaining, carrying on and continuing."

*Link*, 180 Mont. at 477, 591 P.2d at 219 (quoting *State Farm Mut. Auto. Ins. Co. v. Pan Am. Ins. Co.*, 437 S.W.2d 542, 545 (Tex. 1969)).  We held that the Park Commission's "failure to maintain and refusal to operate the system" was a breach of the contractual requirement to "operate and maintain" the tramway.  *Link*, 180 Mont. at 478, 591 P.2d at 219.

¶16     Intrinsic within the definition of "maintenance" we cited in *Link* was that the acts of "preservation" or "repair" or "support" or "sustaining" or "continuing" would occur *on* the item being maintained.  "Maintenance" as constituting work on the actual object is a meaning commonly understood by other courts.  "Maintenance" includes "the act of repairing the covered automobile."  8A Steven Plitt et al., *Couch on Insurance* § 119:36 (3d ed. 2014) (citing Louisiana, Pennsylvania, Texas, Wisconsin, and New York decisions).  In an automobile insurance contract, New York defined "maintenance" as "performance of work on an intrinsic part of the mechanism of the car and its overall function."  *Guishard v. Gen. Sec. Ins. Co.*, 875 N.E.2d 881, 882 (N.Y. 2007) (internal quotations omitted).  Similarly, Oklahoma defined "maintenance" in an automobile insurance contract as "all acts which come within its ordinary scope and meaning, including acts of commission or omission relative to the external and mechanical condition of a vehicle."  *Ply v. Nat'l Union Fire Ins. Co.*, 81 P.3d 643, 649 n.13 (Okla. 2003).  "Maintenance" is defined as the "care and work put into property to keep it

9

operating and productive; general repair and upkeep." *Black's Law Dictionary* 1097 (Bryan A. Garner ed., 10th ed. 2014).

¶17 Even if we were to assume, for sake of argument, that cutting down trees constituted maintenance of a vehicle, the policy would not extend coverage for the damages here. Placing the word "maintenance" back within the provision at issue requires that the damage "result from" the maintenance of the covered vehicles. Fitte's decision to dispose of the branches by burning them and his action of starting the fire occurred after the trees had been cut down. As Fitte admitted in his deposition, the perceived risk to his vehicles was eliminated when he felled the trees. Fitte could have disposed of the trees in any number of ways, demonstrating that his decision to burn the branches was not an inherent part of vehicle maintenance. *See Wendell*, ¶ 54 (the phrase "arise out of the use [of a vehicle]" meant the injuries must "originate from, or grow out of, or flow from the use of the . . . vehicle."). Thus, the District Court's conclusion that burning the trees was a necessary part of preventing damage to, and thus maintaining, Fitte's vehicles, was incorrect.

¶18 Accordingly, the District Court's declaration of coverage under the Mountain West commercial automobile policy is reversed.

/S/ JIM RICE

We concur:

/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ MICHAEL E WHEAT

10