DA 09-0242

FILED

June 9 2010

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 134

ELEANOR MONROE, Individually
and as the Personal Representative
of the Estate of Hugh Monroe,

Plaintiff and Appellant,

v.

COGSWELL AGENCY and SAFECO
INSURANCE COMPANY of ILLINOIS,

Defendants and Appellees.

APPEAL FROM: District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. CDV 04-385
Honorable Kenneth R. Neill, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Thomas A. Marra (argued); Marra, Sexe, Evenson & Bell, P.C.;
Great Falls, Montana

For Appellees:

Richard E. Gillespie (argued); Keller, Reynolds, Drake, Johnson
& Gillespie, P.C.; Helena, Montana (Attorneys for Cogswell Agency)

Carey Matovich (argued); Eric E. Holm; Matovich & Keller, P.C.;
Billings, Montana (Attorneys for Safeco Insurance Company)

For Amicus Montana Trial Lawyers Association:

Lawrence A. Anderson, P.C. (argued); Attorney at Law; Great Falls,
Montana

Amy Eddy; Bottomly & Eddy Trial Attorneys, PLLP; Kalispell, Montana

Argued and Submitted: January 20, 2010
Decided: June 9, 2010

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1     Appellant Eleanor Monroe (Monroe) appeals from the decision of the Eighth Judicial District Court, Cascade County, denying her underinsured motor vehicle coverage and granting summary judgment in favor Safeco Insurance Company (Safeco) and Cogswell Agency (Cogswell).  We affirm in part, reverse in part and remand for further proceedings.

¶2     We consider the following issues on appeal:

¶3     *1.  Whether the District Court erred in granting summary judgment in favor of Safeco.*

¶4     *2.  Whether the District Court erred in granting summary judgment in favor of Cogswell.*

¶5     *3.  Whether the District Court erred in granting summary judgment on the issue of whether Cogswell acted as Safeco's agent.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶6     On November 19, 2003, Eleanor and Hugh Monroe (the Monroes) were traveling as passengers in Hugh Monroe's 2003 Dodge Durango.  Their daughter-in-law, Laura Monroe (Laura) was driving the vehicle and lost control.  In the ensuing accident all three sustained serious injuries.  Hugh Monroe suffered the worst injuries and has since died.

¶7     At the time of the accident the Monroes were named insureds on two Safeco policies which provide coverage for their six vehicles.  Under the Monroes' two policies bodily injury liability was limited to $100,000 each person and $300,000 each occurrence while property damage liability was limited at $50,000 each occurrence.  In addition, medical payments under the policy were limited to $5,000.  Finally, uninsured motorist

2

coverage (UM) and underinsured motorist coverage (UIM) were limited to $100,000 each person and $300,000 each accident. Laura and her husband Hughie also carried a Safeco policy for their two vehicles. Laura and Hughie's policy had the same coverage as the Monroes.

¶8    Following the accident, the Monroes recovered $5,000 of medical payment benefits for each of the six vehicles they owned and $5,000 of medical payment benefits for each of the two vehicles covered under Laura and Hughie's policy. Safeco also paid an additional $100,000 to each of the Monroes under both their own policy and Laura and Hughie's policy. In total, Safeco paid out $480,000 to the Monroes. Nevertheless, on April 13, 2004, Monroe, on behalf of herself and in her capacity as the personal representative of the estate of Hugh Monroe, filed a complaint for declaratory judgment claiming an entitlement to coverage under the UIM provisions of the insurance policies. In addition, Monroe claimed that Cogswell, which had helped them secure the Safeco policies at issue here, was negligent due to the agency's failure to obtain sufficient coverages.

¶9    On Safeco's motion, the District Court granted summary judgment in Safeco's favor and certified that judgment as final pursuant to M. R. Civ. P. 54(b). Monroe filed a notice of appeal which we dismissed without prejudice on December 7, 2006. Subsequently, the District Court granted Safeco's motion for summary judgment on the grounds that Cogswell was not its agent. The District Court also granted Cogswell's

3

summary judgment motion on the grounds that it had no duty to advise the Monroes or to produce adequate coverage.  Monroe appeals.

¶10  Additional facts are set forth below where relevant.

## STANDARD OF REVIEW

¶11  Summary judgment is proper only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *Newbury v. State Farm Fire & Cas. Ins. Co. of Bloomington, Ill.*, 2008 MT 156, ¶ 14, 343 Mont. 279, 184 P.3d 1021.  We review a district court's summary judgment decision de novo using the same criteria as the district court.  *Newbury*, ¶ 14.

## DISCUSSION

¶12  **1.  *Whether the District Court erred in granting summary judgment in favor of Safeco.***

¶13  With respect to Safeco, the controversy here boils down to whether Monroe is entitled to UIM coverage over and above the $480,000 she has already received from Safeco under both her own policies and Laura and Hughie's policy.  In granting Safeco's motion for summary judgment the District Court, drawing parallels between our reasoning in *Stutzman v. Safeco Ins. Co. of Am.*, 284 Mont. 372, 945 P.2d 32 (1997) and the case at bar, opined that in this instance "[t]he insuring language is clear, obvious and unambiguous to a person of average intelligence."  The District Court held that the policy language excluding from UIM coverage "any vehicle or equipment . . . [o]wned by or furnished for the regular use of you or any family member" clearly and unambiguously barred the Monroes from receiving UIM coverage.  The District Court reasoned that since

4

the injuries the Monroes sustained occurred in their own vehicle, Safeco was, as a matter of law, not required to make UIM payments to the Monroes.

¶14 On appeal, the parties vigorously dispute this conclusion. Parroting the District Court's ruling, Safeco argues that "[u]nder the contract's usual, common sense language, the Durango [in which the accident occurred] is not an 'underinsured motor vehicle' because it was owned by Hugh, who is an insured and is Eleanor's husband (a resident spouse and family member)." Safeco also contends our decision in *Stutzman* is both applicable to, and dispositive of, the controversy presented here. Monroe counters that an insurance policy, as a contract of adhesion, must be strictly construed with all ambiguities being resolved in favor of the insured. She asserts that the policy language at issue here is ambiguous and that the exclusionary provisions are in conflict with the declarations pages so that "in practically all circumstances, [the] Monroes will recover nothing from the UIM coverage." She also maintains that our decision in *Stutzman* is inapplicable and that the insurance contract violates public policy.

¶15 It is well established that in construing and analyzing the terms of an insurance policy we look first to the policy's plain language. *Stutzman*, 284 Mont. at 379. In doing so we apply the "common sense meaning as viewed from the perspective of a reasonable consumer of insurance products." *Stutzman*, 284 Mont. at 376. We have explained that as with any contract, a court "may not rewrite the contract at issue, but must enforce it as written if its language is clear and explicit." *Stutzman*, 284 Mont. at 376. After construing the language of the policy itself, we next look at whether, in light of our

5

construction, the insurance contract violates public policy. *See generally Stutzman*, 284 Mont. 372 (construing the policy language first and then looking to public policy in order to determine if the policy is enforceable). In keeping with this mode of analysis, we turn first to the policy language of the Monroes' insurance contract to determine whether its "common sense meaning" entitles the Monroes to UIM coverage.

¶16 In pertinent part, the UIM provisions of both the Monroes' and Laura and Hughie's insurance policies provide that Safeco:

> [w]ill pay damages which any insured is legally entitled to recover from the owner or operator of an . . . underinsured motor vehicle because of bodily injury:
>
>> 1. Sustained by an insured; and
>> 2. Caused by an accident.

The policy defines "underinsured motor vehicle" as:

> a land motor vehicle or trailer of any type to which a bodily injury liability bond or policy applies at the time of the accident but the amount paid for bodily injury under the bond or policy to an insured is not enough to pay the full amount the insured is legally entitled to recover as damages.
>
> However, "underinsured motor vehicle" does not include any vehicle or equipment:
>
>> 1. Owned by or furnished for the regular use of you or any family member.

¶17 Under these provisions alone, we agree with Safeco that the plain language of the policy, clearly excludes the Monroes' vehicles from the definition of an underinsured motor vehicle. This so called "owned vehicle" exclusion clearly states that an underinsured motor vehicle does not include motor vehicles "[o]wned by or furnished for

6

the regular use of you or any family member." It is undisputed that the Monroes owned both the Dodge Durango in which the accident happened, and the five other motor vehicles insured under their Safeco policies. As such, all of these vehicles are clearly and unambiguously excluded from the policy definition of an underinsured motor vehicle. Since the Monroes' vehicles are excluded under the plain language of this "owned vehicle" exclusion, Monroe is not entitled to UIM coverage under her own policies. Having concluded that the plain language defeats Monroe's claim to UIM coverage under her own policies, we now turn to the question of whether this insurance contract violates public policy.

¶18     With respect to public policy, Monroe first argues that the limiting language in the Safeco policies violates public policy because it creates illusory UIM coverage. Monroe contends that with the "owned vehicle" exclusion, the Monroes would have no underinsured coverage in "virtually all circumstances where the highest probability of injury would occur to them (riding in one of their six vehicles)." Monroe submits that, based on our holdings in *Hardy v. Progressive Specialty Ins. Co.*, 2003 MT 85, 315 Mont. 107, 67 P.3d 892 and *Mitchell v. State Farm Ins. Co.*, 2003 MT 102, 315 Mont. 281, 68 P.3d 703, such illusory coverage is an impermissible violation of public policy. We disagree that the coverage is illusory.

¶19     Once again, we begin our analysis by looking to the plain language of the policy. Here, while the language makes UIM coverage unavailable for single car crashes that only involve the insured's own vehicle, UIM coverage is available in all other accidents

so long as the accident involves another vehicle that is not owned by the insured. In other words, even if the Monroes were driving or riding in their own vehicle, as long as another motor vehicle they did not own was involved in the accident, the policy would provide UIM coverage to the Monroes. In fact, the only instance in which the "owned vehicle" exclusion renders UIM coverage per se unavailable is when the accident only involves the insured's own vehicle. Accordingly, far from being illusory, Monroe's contention that they paid valuable consideration for non-existent UIM coverage is unfounded and thus, the provisions do not violate public policy.

¶20　Monroe also argues that the District Court erred in relying on *Stutzman* to support summary judgment in favor of Safeco. In *Stutzman*, we concluded that public policy supports enforcing UIM exclusionary language that denies coverage in a single car accident if the only vehicle in the accident is owned by the insured. We explained that "invalidat[ing] an exclusion which prohibits recovery of underinsured motorist benefits where the vehicle in question is owned by or furnished for the regular use of the named insured or any relative, would, in effect, convert underinsured motorist coverage into liability coverage and permit policyholders to substitute inexpensive underinsured motorist coverage for more expensive liability coverage." *Stutzman*, 284 Mont. at 381 (citing *Kim v. State Farm Mut. Automobile Ins. Co.*, 952 F.2d 314, 316 (9th Cir. 1991)) (citations omitted). To avoid this reasoning, Monroe maintains that the concern expressed in *Stutzman* over substituting UIM coverage for liability coverage is not present in this case because Laura and Hughie have a separate Safeco insurance policy of

8

their own. Monroe contends that since she did not demand liability coverage under their own policy, the monies received from Safeco came first from Laura's policy ($10,000 in medical payments plus $100,000 to each of the Monroes) and secondly from the Monroes' own policy ($60,000 in medical payments plus $100,000 to each of the Monroes). Thus, her argument proceeds, the Monroes are free to tap their own UIM coverage without violating the principle laid out in *Stutzman* that policy holders should not be able to substitute inexpensive UIM coverage for more expensive liability coverage. The plain language of the policies however, makes this argument untenable.

¶21 In relevant part the Monroes' policies state that:

> If there is other applicable liability insurance we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits. *However, any insurance we provide for a vehicle you do not own shall be excess over any other collectible insurance.* [Emphasis added.]

This language clearly explains that under the Safeco policies, the initial $200,000 in liability coverage paid to the Monroes came from their own policy, which covered Laura as a permissive driver. Rather than being the primary source of liability coverage as Monroe asserts, Laura and Hughie's policy provided only secondary "excess" coverage of $200,000.

¶22 As we reasoned in *Stutzman*, one of the purposes behind the exclusionary language is to limit UIM coverage to situations where the injured party has no control over the tortfeasor's policy's limits. In the present case, Laura was the tortfeasor and she was insured by two liability policies—her own policy and the Monroes' policy (because

9

she was a permissive driver, and, thus an insured). The only way UIM coverage could potentially be available is if the limits of both policies were exhausted. The Monroes controlled how much those combined limits would be because one of the policies was their own. Unlike *Lemen v. Allstate Ins. Co.*, 938 F. Supp. 640 (D. Haw. 1995), in which the Plaintiff had received liability coverage from a separate policy and sought only UIM coverage under her father's policy, Monroe is seeking liability and UIM coverage under the same policy. Invalidating the exclusionary language of the Monroes' policies would create an incentive for policy holders such as the Monroes to substitute inexpensive underinsured motorist coverage for more expensive liability coverage. This, as we explained in *Stutzman*, contravenes public policy. Accordingly, Monroe's argument that *Stutzman* and the public policy concerns underlying that decision are not relevant here is unfounded. The exclusionary language and public policy concerns support the District Court's granting of summary judgment in favor of Safeco.

¶23    The dissent contends that, although the Monroes' vehicle is an "owned vehicle" and thus excluded from UIM coverage, the two vehicles owned by Hughie and Laura are not owned by Hugh and Eleanor and thus not excluded as the basis for UIM coverage. This argument however, does not account for the plain meaning of the policy exception which provides that, "[t]he owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the . . . underinsured motor vehicle." Here, Laura's liability for the Monroes' damages did not arise out of the ownership of her two uninvolved vehicles. Rather, her liability arose out of the fact that she was the tortfeasor

10

and the negligent driver of the Monroes' vehicle. Her liability as a driver is independent of her ownership of two uninvolved vehicles.

¶24 The ownership language upon which the dissent relies would arguably have application in a situation where John Doe, an owner of a vehicle, allows a permissive driver to use his vehicle and the driver negligently injures a third party. The driver would be liable as the user and Doe would be liable as the "owner" of the vehicle involved in the accident. Here, the vehicles owned by Laura were not involved in the accident and her ownership of them did not give rise to her liability.

¶25 The dissent's argument that since Safeco paid $200,000 out of Laura's policy, Laura's liability therefore arises out of her ownership of her own vehicles is untenable. The $200,000 payment the Monroes received from Laura's policy came from Laura's "Liability Coverage" not from her UIM coverage. Under her policy, Safeco "will pay damages for bodily injury or property damages for which any insured becomes legally responsible because of an auto accident." Safeco's payment under this "Liability Coverage" was based solely on Laura's status as a tortfeasor. It had nothing to do with the fact that she owned vehicles of her own which were not involved in the accident. Safeco's payment under the "Liability Coverage" provision of Laura's policy does not trigger an obligation to pay UIM coverage. Rather, as the policy clearly states, UIM coverage only attaches when the liability arises out of the "ownership, maintenance or use" of her vehicle. As we have explained above, it did not.

¶26   **2. Whether the District Court erred in granting summary judgment in favor of Cogswell.**

¶27   In its order, the District Court concluded Cogswell was entitled to summary judgment because Monroe could not, as a matter of law, meet her burden of proving the causation, duty or breach elements of her negligence claim.  On appeal, Monroe argues that the pleadings, depositions, and affidavits present numerous genuine issues of material fact which the District Court failed to address and which "preclude summary judgment as to whether Cogswell was negligent under either a professional or reasonable man standard."  She points to the following eight genuine issues of material fact that she claims preclude summary judgment:  (1) how Cogswell could procure insurance for the Monroes and verify what insurance they sought without ever having communicated with them; (2) whether Cogswell was negligent in failing to advise the Monroes that they had inadequate coverage; (3) whether Cogswell explained how an umbrella policy worked; (4) whether Cogswell failed to explain the limits of UIM coverage under the Safeco policies; (5) whether the Monroes knew they had inadequate coverage and whether they made a conscious choice to keep inadequate coverage; (6) whether Cogswell's failure to assess the financial status of the Monroes was negligent; (7) whether Cogswell acted as an expert for the purposes of procuring insurance, given Cogswell's representation to the Monroes that it had specialized knowledge; and (8) whether in 2003-2004 an umbrella policy was available in Montana for the Monroes that would have supplemented the liability, UIM, and UM limits.

12

¶28 Cogswell counters that the District Court properly granted summary judgment because Monroe failed to meet the burden of presenting "material and substantial evidence . . . to raise a genuine issue of material fact." Cogswell further maintains that at the time it procured insurance coverage for the Monroes there was no policy approved in Montana that would have provided the Monroes with the coverage they now seek. Cogswell argues that since Monroe did not produce evidence of such a Montana approved policy, the District Court properly granted summary judgment in favor of Cogswell.

¶29 It is well established that summary judgment is appropriate when there is no genuine issue of fact material to the substantive principles upon which the movant relies for judgment as a matter of law. *Richland Natl. Bank & Trust v. Swenson*, 249 Mont. 410, 417, 816 P.2d 1045 (1991). In proving her negligence claims, Monroe has the ultimate burden of proving (1) a duty (2) breached by Cogswell in some way (3) that caused (4) the damages claimed. *Abraham v. Nelson*, 2002 MT 94, ¶ 11, 309 Mont. 366, 46 P.3d 628. As a general principle however, we have held that negligence issues are generally not susceptible to summary judgment adjudication but should be resolved by trial in the ordinary manner. *Fisher v. Swift Transp. Co.*, 2008 MT 105, ¶ 12, 342 Mont. 335, 181 P.3d 601. Nevertheless, at the summary judgment stage the moving party bears the initial burden and must "make a clear showing as to what the truth is so as to exclude any real doubt as to the existence of any genuine issue of material fact." *Toombs v. Getter Trucking*, 256 Mont. 282, 284, 846 P.2d 265 (1993).

13

¶30    In determining whether genuine issues of material fact exist, all reasonable inferences must be drawn in favor of the non-moving party so that if there is any doubt as to the existence of a genuine issue of material fact, that doubt must be resolved in favor of the party opposing summary judgment. *Lorang v. Fortis Ins. Co.*, 2008 MT 252, ¶ 38, 345 Mont. 12, 192 P.3d 186; *Newbury*, ¶ 14.  Therefore, not until Cogswell meets its initial burden to exclude any real doubt as to what the truth is, does the burden shift to Monroe and force her to "present substantial evidence, as opposed to mere denial, speculation or conclusory statements . . . ." *Thornton v. Flathead Co.*, 2009 MT 367, ¶ 13, 353 Mont. 252, 220 P.3d 395 (citations omitted).

¶31    Turning to the duty element of Monroe's negligence claim, we note at the outset that duty is a question of law. *Nautilus Ins. Co. v. First Natl. Ins.*, 254 Mont. 296, 299, 837 P.2d 409 (1992).  In its order, the District Court concluded that an insurance agency does not owe a duty of care to advise clients "as to [their] coverage needs."  Without concluding that a professional duty of care should never be applied to insurance agencies, we acknowledge that no such heightened duty of care has yet been recognized under Montana law.  *See Lee v. Andrews*, 204 Mont. 527, 532-33, 667 P.2d 919 (1983) (explaining that a duty arises once a client requests specific coverage); *see also R.H. Grover, Inc., v. Flynn Ins. Co.*, 238 Mont. 278, 777 P.2d 338 (1989).  However, we need not address the issue of a heightened duty in the present case because the facts and arguments advanced by Monroe do not warrant such consideration.  With respect to whether Cogswell breached a duty of care in failing to advise the Monroes or assess their

insurance needs, Monroe has relied on the alleged failures of Cogswell's agent John David Summerhays (Summerhays). However, the record demonstrates that Summerhays was not involved in soliciting or procuring the Safeco policy at issue here. Because Monroe's claims that Summerhays negligently failed to advise the Monroes or assess their insurance needs were only relevant to the Hartford policy that Summerhays procured (the Hartford policy lapsed and is separate from the Safeco policy under which Monroe's claims arise), we conclude that the District Court properly determined that Cogswell was entitled to summary judgment on Monroe's claims that: (1) Cogswell negligently failed to advise the Monroes that they had inadequate coverage; (2) that Cogswell failed to explain how an umbrella policy worked; (3) that Cogswell negligently failed to explain the limits of UIM coverage under the Safeco policies; (4) that Cogswell negligently failed to assess the financial status of the Monroes; and (5) that Cogswell acted as an expert for the purposes of procuring insurance. This conclusion notwithstanding, summary judgment is not appropriate with respect to whether Cogswell was negligent is failing to provide the Monroes with higher policy limits.

¶32     It is well established that an insurance agent owes an absolute duty to obtain the insurance coverage which an insured directs the agent to procure. *See Lee*, 204 Mont. at 532-33 (citing *Gay v. Lavina State Bank*, 61 Mont. 449, 458, 202 P.2d 753 (1921)). In her first amended complaint, Monroe alleged that Cogswell negligently failed to procure the insurance coverage that the Monroes requested. Thus, the issue at summary judgment is whether the Monroes requested higher policy limits, and if so, whether Cogswell failed

15

to honor that request. Accordingly, in order to shift the burden to Monroe and require her to present substantial evidence in support of her claim, Cogswell must make an initial showing as to what the truth is so as to exclude any real doubt as to the existence of a genuine issue of material fact. *See Farmers Union Mut. Ins. Co. v. Staples*, 2004 MT 108, ¶ 18, 321 Mont. 99, 90 P.3d 381 (explaining that the moving party must establish the absence of a genuine issue of material fact before the burden shifts to the non-moving party); *Toombs*, 256 Mont. at 284; *Grenz v. Prezeau*, 244 Mont. 419, 423, 798 P.2d 112 (1990) (explaining that "[t]he moving party through supporting affidavits first must demonstrate that a genuine issue of fact does not exist"); *Kober v. Stewart*, 148 Mont. 117, 122, 417 P.2d 476 (1966). In other words, in order to obtain summary judgment, Cogswell bore the heavy burden of demonstrating, in a manner sufficient to exclude any real doubt, that the Monroes did not request higher policy limits than they received.

¶33 Here, in granting Cogswell's motion for summary judgment, the District Court specifically acknowledged that Jennifer Webster (Webster), the Cogswell representative who wrote and sold the Safeco policy to the Monroes, and the only living person who could shed light on what coverage the Monroes requested, failed to testify or provide an affidavit. The District Court's conclusion that summary judgment was appropriate because "Eleanor cannot remember the details of the transaction . . . Robin and Dave did not participate in the transaction . . . [and] Hugh died in 2006" improperly placed the initial burden at summary judgment on the non-moving party. As we have explained, the initial burden to exclude any real doubt as to what the truth is, rests squarely on

16

Cogswell. In moving for summary judgment, Cogswell has made no affirmative showing of any facts. Rather, in showing that four of five potential witnesses have either died or have no recollection or knowledge of the events, Cogswell has demonstrated that the case hinges on the testimony of its former employee Webster. Without a deposition or affidavit from Webster, Cogswell has not met its initial burden of affirmatively excluding any real doubt as to the facts. Accordingly, Cogswell did not shift the burden to Monroe to provide "substantial evidence that raises a genuine issue of material fact," *Glacier Tennis Club at the Summit, LLC v. Treweek Constr. Co.*, 2004 MT 70, ¶ 21, 320 Mont. 351, 87 P.3d 431, overruled on other grounds, and the District Court's grant of summary judgment was premature.

¶34 While we acknowledge that a *complete failure* of proof concerning an essential element of a claim makes judgment appropriate as a matter of law, we cannot conclude that here there is a complete failure of proof. Without the testimony of Webster, which Cogswell admits, and the District Court determined, was directly relevant to the issuance of the Safeco policy at issue, it is premature to conclude that Monroe cannot meet her ultimate burden at trial. In this instance, where all the parties (and the District Court) agree that it was Webster who sold the Monroes the Safeco policy, her testimony must be presented before a court can conclude as a matter of law that Monroe cannot succeed on her negligence claim. To hold otherwise would ignore the plain language of our case law which clearly explains that, in order to meet its burden, the moving party, through supporting affidavits, must make a clear showing as to what the truth is so as to exclude

17

any real doubt as to the existence of any genuine issue of material fact. Furthermore, the dissent's concern that our conclusion today will result in sending every case to trial because litigants will avoid summary judgment by withholding their evidence is unfounded. This is not an instance of mere speculation as to the existence of a potential witness on the part of a litigant so as to avoid summary judgment. Here, the District Court acknowledged, and Cogswell implicitly conceded, that the only individual that can affirmatively testify as to whether the Monroes requested higher limits is Webster. In the absence of her testimony, summary judgment is not appropriate.

¶35    The District Court also reasoned that Monroe, having failed to produce an alternate, more expansive UIM or umbrella insurance policy, could not meet the causation element of her negligence claim. However, if, as alleged, Monroe requested higher limits of liability coverage, that request could have been honored within the context of the Safeco policy that was issued. Monroe did not need to produce a different or alternative policy in order to prove her claim that she requested higher liability limits.

¶36    *3. Whether the District Court erred in granting summary judgment on the issue of whether Cogswell acted as Safeco's agent.*

¶37    At the outset, we note that for the purposes of determining whether Cogswell and Safeco had an agency relationship we must first determine whether Cogswell, as an insurance agency, is an independent soliciting agent or a general agent. An independent soliciting agent is one that does not have an exclusive relationship with one particular insurer. Since Cogswell had access to, and offered the policies of, at least six different

18

insurance companies at the time it engaged with the Monroes, Cogswell was acting as an independent soliciting agent when it performed the insurance transactions at issue here.

¶38 As an independent soliciting agent, the process Cogswell goes through in obtaining insurance coverage for a client consists of two independent steps. First, Cogswell discusses the client's specific situation and individual needs. At that point, Cogswell has not selected a specific insurer to cover the client's needs. Second, after the client has described his or her specific needs, Cogswell selects a specific policy from a specific insurer to which the client then applies. This distinct two-step process is at the heart of the agency issue and, although we have not specifically addressed it, our jurisprudence suggests, and other jurisdictions conclude, that for the purposes of agency analysis, an independent soliciting agent only becomes an agent of the insurer during the second step—after it has selected that insurer's specific policy.

¶39 In *Deonier & Assocs. v. Paul Revere Life Ins. Co.*, 2000 MT 238, 301 Mont. 347, 9 P.3d 622, on which Monroe relies heavily, we addressed the issue of agency between an insurance agent and the insurance provider and concluded that once an agency selects a particular policy from an insurer, that agency becomes the agent of that insurer. In that case, the original plaintiff, Kathryn Vestal, alleged that Deonier had negligently misrepresented the coverage under the Paul Revere insurance policy that Deonier had selected for her. In holding that Deonier was the agent of the insurer, we explained that "for purposes of soliciting and procuring the insurance and preparing the application [insurance agencies] are agents for the insurer." *Deonier*, ¶ 56. Although we did not

19

specifically acknowledge it, our resolution of that case only considered the second step in the insurance procurement process—after the agent has selected a specific provider's policy. We concluded that while an agent who accesses the policies of several insurance companies and who is solicited by the client to investigate and select the appropriate insurance company is acting as the agent of the client, once the agency has solicited and procured a specific policy, that agency becomes an agent of the insurer. *Deonier*, ¶ 56. This reasoning is supported by the conclusions of other jurisdictions as well.

¶40 In *Etheridge v. Atlantic Mut. Ins. Co.*, 480 A.2d 1341 (R.I. 1984), the Rhode Island Supreme Court overturned a lower court's holding that an insurance agent who represented numerous insurance companies was the agent of the insurer when determining the appropriate amount of insurance. The *Etheridge* Court explained that an independent soliciting agent is the authorized agent for the insurer only once the agent has selected a policy from that particular insurer. *Etheridge*, 480 A.2d at 1346. The *Etheridge* Court opined that at all times before the procurement of a specific policy, the soliciting agent is an agent of the client seeking insurance coverage. *Etheridge*, 480 A.2d at 1346.

¶41 The Rhode Island Supreme Court's decision in *Etheridge* is eminently sensible and thus, we reject Monroe's argument that an agency is an agent of the insurer from the moment a client solicits the agency to procure insurance. Under such an approach, as soon as a client solicits an entity such as Cogswell to assist in procuring insurance, all insurance companies from which the agent could possibly select a policy would become

20

liable through their principal/agent relationship with the insurance agency. Accordingly, we now explicitly conclude what we implicitly assumed in *Deonier*—that the insurance procurement process is logically divided into two steps and only after the insurance agency solicits a specific policy from a particular insurer does the principal/agent relationship arise with the insurer. Applying this analytical approach, we now turn to the specific facts of the case at bar.

¶42    In keeping with the two-step nature of the insurance procurement process, Safeco argues that "the Monroes' allegations of negligence against Cogswell fall under the first step of this process" when Cogswell was acting on behalf of the Monroes not as an agent of Safeco. To support this contention, Safeco characterizes Monroe's allegations as focused on Cogswell's failure to select appropriate insurance coverage from one of many insurance carriers with which Cogswell was affiliated. Based on this characterization, Safeco maintains that no agency relationship existed because at the stage Cogswell's negligence was alleged to have occurred, Cogswell had not selected the Safeco policy at issue. Safeco thus urges that we uphold the District Court's summary judgment decision in its favor. While we agree with Safeco that no agency relationship existed with regard to those allegations of negligence alleged to have occurred before Cogswell selected Safeco's policy, we conclude that for at least one of Monroe's contentions, the alleged negligence occurred after Cogswell selected the specific Safeco policy and thus, after Cogswell became Safeco's agent.

21

¶43    Here, Monroe's complaint alleges that Safeco and Cogswell negligently failed to procure "appropriate and/or adequate amounts of coverage" for the Monroes.  As we have already explained, Monroe's claims regarding Cogswell's failure to properly assess their financial status, or explain how an umbrella policy worked were appropriately resolved in favor of Cogswell at summary judgment.  However, throughout the course of this controversy, Monroe has also contended that Cogswell acted negligently by failing to procure adequate coverage, including higher policy limits that the Monroes requested.  Monroe's allegation that Cogswell negligently failed to procure the higher policy limits they requested, necessarily implies that Cogswell had solicited the specific Safeco policy at issue—a contention that clearly falls under the second step of the insurance procurement process and implicates an agency relationship between Cogswell and Safeco as a matter of law.

¶44    Thus, we affirm the District Court to the extent that its conclusions applied to Monroe's claims that were alleged to have occurred before Cogswell selected the Safeco policy.  With respect to Monroe's allegation that Cogswell negligently failed to procure the higher policy limits the Monroe's requested however, we conclude that the District Court erred and that Cogswell was acting as Safeco's agent.

¶45    Affirmed in part, reversed in part, and remanded for proceedings in accordance with this Opinion.

/S/ W. WILLIAM LEAPHART

We concur:
/S/ MIKE MCGRATH

22

Justice Michael E Wheat dissents.

¶46    I concur with the Court's disposition of Issues 2 and 3. I dissent from the Court's resolution of Issue 1.

¶47    At the outset, I agree with the Court that it is well established that in construing and analyzing the terms of an insurance policy, we first look to the plain language of the policy. *See Stutzman v. Safeco Ins. Co. of Am.*, 284 Mont. 372, 376, 945 P.2d 32, 34 (1997). We "may not rewrite the contract at issue, but must enforce it as written if its language is clear and explicit." *Id.*

¶48    Before looking specifically at the language of the policy, there are several points to be made: (1) under Part C (UNINSURED/UNDERINSURED MOTORISTS COVERAGE), the Monroes' policy provides for UIM coverage from *either* the owner *or* operator of an underinsured vehicle; and, (2) UIM coverage is available after liability coverage is exhausted under *any* applicable liability policy. In my view, the plain and unambiguous language of the Monroes' policy provides that Laura's vehicle is "underinsured" for the purpose of providing UIM coverage.

¶49    Under Part A of both Laura's and the Monroes' policies, Safeco's obligation to provide  liability coverage is described as follows:

> We will pay damages for bodily injury . . . for which any insured becomes legally responsible because of an auto accident.

Laura is a named insured under her own policy, and under the Monroes' policy, she is a "person using [the Monroes'] covered auto." Laura is an "owner" under her own policy, and she is an "operator" and permissive user under the Monroes' policy. Safeco was

23

obligated to pay liability coverage—and in fact did pay liability coverage—because under both policies, Laura was legally responsible for the Monroes' injuries.

¶50 Under Part C of the Monroes' policy, Safeco's obligation to provide UIM coverage arises from the Monroes' legal right to recover damages that exceed the liability coverage from *either* an owner *or* operator of an underinsured vehicle. By removing all language related to operator and leaving only language related to owner, the pertinent parts of Part C read as follows:

> A.    We [Safeco] will pay damages which an insured [the Monroes] is legally entitled to recover from the *owner* [Laura] . . . of an . . . underinsured motor vehicle because of bodily injury:
>
> > 1. Sustained by an insured; and
> > 2. Caused by an accident.
>
> The *owner's* [Laura's] . . . liability [legal responsibility to pay damages] for these damages must arise out of the *ownership* . . . of the . . . underinsured motor vehicle.
>
> .    .    .
>
> We will pay under Underinsured Motorists Coverage only if . . . :
>
> > 1. The limits of liability under *any* applicable bodily injury liability . . . policies have been exhausted by payment of . . . settlements . . . .

(Emphasis added.) To me, this language is clear and unambiguous. Laura is the owner of a motor vehicle covered by an applicable liability policy, the limits of which were paid to the Monroes because of Laura's legal responsibility for the Monroes' injuries in an auto accident. Under the plain language of the Monroes' policy, Safeco is obligated to

24

provide UIM coverage because Laura is the owner of an underinsured vehicle as defined under the policy.

¶51 The Court correctly concludes that under the plain language of the Monroes' policy, their vehicles are excluded as "underinsured vehicles." Opinion, ¶ 17. However, Laura's vehicle is not excluded as an "underinsured vehicle." Again, removing all language related to operator and leaving language related to owner, Part C of the Monroes' policy defines an underinsured vehicle as follows:

> C. "Underinsured motor vehicle" means *a land motor vehicle . . . to which a bodily liability . . . policy* [Laura's] *applies at the time of the accident but the amount paid for bodily injury under that . . . policy to an insured* [the Monroes] *is not enough to pay the full amount the insured* [the Monroes] *is legally entitled to recover as damages.*
>
> However, "underinsured motor vehicle" does not include any vehicle . . . :
>
> 1. Owned by . . . you [the Monroes] . . . .

(Emphasis added.) Again, the language is clear and unambiguous. Laura is the owner of a vehicle covered by a liability policy under which policy limits were paid to the Monroes. Thus, her vehicle qualifies as an underinsured vehicle under the policy definition. The only vehicles excluded under the policy definition are those owned by the Monroes. Laura's vehicle is not excluded.

¶52 Because the plain, clear, and unambiguous language of the Monroes' policy is broad enough to incorporate Laura's vehicle under its definition of underinsured motor vehicle, the Monroes are entitled to make a claim for UIM coverage under their policy. This claim would not violate any of the principles of public policy established in

25

*Stutzman*—i.e., "double-dipping" from the same policy and converting cheap UIM coverage to expensive liability coverage when the insured controls the amount of liability coverage. *Stutzman*, 284 Mont. at 382, 945 P.2d at 36. The Monroes had no control over the amount of liability coverage that Laura had obtained for her vehicle.

¶53 To me, the Monroes' policy clearly provides that Safeco should pay UIM benefits for any damages in excess of the liability coverage from both the Monroes' and Laura's policy. However, other members of this Court, as well as some of the parties, interpret this language differently. Although I disagree with their interpretation, it is another interpretation and as we have held, when the language of the contract is subject to two interpretations, it is ambiguous. *Giacomelli v. Scottsdale Ins. Co.*, 2009 MT 418, ¶ 32, 354 Mont. 15, 221 P.3d 666. Furthermore, when the language of an insurance contract is ambiguous, courts construe the ambiguous provisions against the insurer and in favor of extending coverage. *Giacomelli*, ¶ 31. Applying these well-established principles of interpretation of ambiguous insurance contracts, we should conclude that Part C of the Monroes' policy is ambiguous as to whether Laura's vehicle qualifies as underinsured.

¶54 By way of illustration, I note that the Court points to the policy language that provides, "[t]he owner's or operator's liability . . . must arise out of the ownership, maintenance or use of the . . . underinsured motor vehicle," for the proposition that Laura's liability arose from her use of the Monroes' vehicle "independent of her ownership of two uninvolved vehicles." Opinion, ¶ 23. On the other hand, when the above language is read in conjunction with the language defining an underinsured motor

26

vehicle as one "to which a bodily injury liability . . . policy applies at the time of the accident," I maintain that an equally plausible interpretation is that Laura's vehicles qualify as UIM vehicles. Nowhere in the policy does it state that the underinsured vehicle has to be "involved in the accident," as asserted by the Court. Opinion, ¶ 24. At the very least, the definition of an underinsured motor vehicle is ambiguous and can be read to mean either the Monroes' vehicle or Laura's vehicles. Because this language is ambiguous, we should construe it in favor of the Monroes. *Giacomelli*, ¶ 31.

¶55    Additionally, the Court states that "the $200,000 payment the Monroes received from Laura's policy came from Laura's 'Liability Coverage' not from her UIM coverage" means that this payment "was based solely on Laura's status as a tortfeasor" and had nothing to do with her ownership of vehicles not involved in the accident. Opinion, ¶ 25. I do not dispute Laura's status as a tortfeasor. I do dispute that the policy restricts the tortfeasor to a particular vehicle. The policy language refers instead to "any applicable bodily injury . . . policies . . . [that] have been exhausted by payment of . . . settlements" and says nothing about a particular vehicle. Because Laura's vehicles provided liability coverage that was exhausted by payment of settlements to the Monroes, her vehicles qualify as underinsured, thus allowing UIM coverage available to the Monroes under their policies.

¶56    At the very least, the contrast between my interpretation and the Court's interpretation of this policy provision demonstrates that reasonable minds can differ in their reading of this language. This language is subject to two competing interpretations

27

and therefore is ambiguous. *Giacomelli*, ¶ 32. I maintain, again, that we should construe this ambiguity in favor of the Monroes.

¶57 I would therefore reverse the District Court's grant of summary judgment in favor of Safeco and remand the case for further proceedings. I dissent from our failure to do so.

/S/ MICHAEL E WHEAT

District Court Judge Katherine M. Irigoin, sitting for Justice James C. Nelson, joins in the foregoing dissent.

/S/ KATHERINE M. IRIGOIN

Justice Brian Morris dissents.

¶58 I dissent. I agree with that portion of Justice Wheat's dissent that deems ambiguous Part C of the Monroes' policy. ¶ 53. I believe that Part C presents a situation where the definition of "underinsured motor vehicle" reasonably could be construed in two different ways by a consumer with average intelligence, but untrained in the law or the insurance business. *Mitchell v. State Farm Ins. Co.*, 2003 MT 102, ¶ 26, 315 Mont. 281, 68 P.3d 703. The construction most favorable to the insured must prevail where this ambiguous definition attempts to exclude the liability of the insurer. *Pablo v. Moore*, 2000 MT 48, ¶ 17, 298 Mont. 393, 995 P.2d 460. The District Court construed this

ambiguous definition in favor of Safeco.  I would reverse the District Court's grant of summary judgment in favor of Safeco and remand for further proceedings.

/S/ BRIAN MORRIS

Justice Jim Rice, concurring in part and dissenting in part.

¶59    I concur with the Court on Issue 1 and with affirming the claims in favor of Cogswell under Issue 2.  However, I would likewise affirm the entry of summary judgment on the remaining claim and thus dissent from that portion of Issue 2.[1]  I would thus not address the agency relationship between Cogswell and Safeco under Issue 3.

¶60    I part ways with the Court's conclusion that because Cogswell has not produced testimony from Jennifer Webster, summary judgment is inappropriate.  Opinion, ¶ 33. The Court states that, because Cogswell is the moving party, it "bore the heavy burden of demonstrating, in a manner sufficient to exclude any real doubt, that the Monroes did not request higher policy limits than they received."  Opinion, ¶ 32.  While this may be true in a general sense, the Court overplays the principle and, I believe, distorts the law of summary judgment.   To satisfy its burden as movant, Cogswell needed only to demonstrate that Monroes had provided no evidence that they had actually requested

---

[1] I understand the Court's opinion to reverse the District Court's entry of summary judgment only on Monroes' claim that Cogswell should have obtained higher liability limits.  Based on that assumption, I address that claim only.

29

higher policy limits and thus failed to carry their burden to support their claim with evidence, a burden the Court overlooks.

¶61   In *Grenz v. Prezeau*, 244 Mont. 419, 420, 426, 798 P.2d 112, 112-13, 116 (1990), we affirmed the entry of summary judgment in favor of the lawyer-defendant, recognizing that, while the client-claimant bore the burden of persuasion to support his claim, "no facts" supported the allegations.  We thus concluded that "[a]s a matter of law, Prezeau is entitled to summary judgment because of the *absence of facts* indicating that he negligently handled Grenz's legal affairs."  *Grenz*, 244 Mont. at 426, 798 P.2d at 116 (emphasis added).

¶62   This is a common principle of summary judgment recognized by commentators and other courts.  James Wm. Moore, *Moore's Federal Practice* vol. 11, § 56.13 (3d ed., Mathew Bender Supp. 2010) explains:

> In addition to these basic procedural burdens (always imposed on the movant if summary judgment is to be granted) and counterburdens (imposed on the nonmovant when movant satisfies its initial burden), *the burden of persuasion applicable to the substantive claims of the case also plays a role in summary judgment practice*.  For example, . . . if the movant is defending the claim at issue, *the initial summary judgment burden is satisfied if the movant establishes that the claimant lacks adequate proof of an essential element of the claim*.  Similarly, the substantive trial burden affects the nonmovant's procedural burdens. . . .  [I]f the nonmovant is a claimant, its response burden requires it to submit more substantial material that would support a judgment in its favor after a trial at which nonmovant bore the burden of persuasion.

(Emphasis added.)  *See also* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* vol. 10A, § 2727 (3d ed., West 1998).   The U.S. Supreme Court has explained:

30

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, *there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.* The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986) (emphasis added); s*ee also Lujan v. Natl. Wildlife Fedn.*, 497 U.S. 871, 884, 110 S. Ct. 3177, 3186 (1990); *Corales v. Bennett*, 567 F.3d 554, 570 (9th Cir. 2009); *Thomson v. Idaho Ins. Agency, Inc.*, 887 P.2d 1034, 1037-38 (Idaho 1994); *Klose v. N.D.*, 752 N.W.2d 192, 197 (N.D. 2008); *Franks v. Olson*, 975 P.2d 588, 593 (Wyo. 1999); *Torrealba v. Kesmetis*, 178 P.3d 716, 720 (Nev. 2008); *Howell v. Spokane & Inland Empire Blood Bank*, 818 P.2d 1056, 1059 (Wash. 1991).

¶63    Thus, it is inconsequential that Cogswell produced no statement from Jennifer Webster. Cogswell satisfied its initial summary judgment burden by demonstrating the absence of any evidence in support of Monroes' claim that they had requested Cogswell to obtain higher liability limits. Cogswell outlined that the Monroes' daughter, Robin, had submitted an affidavit stating she had called Cogswell to set up a meeting, but had no other involvement; Eleanor Monroe could not recall any conversations with Cogswell because "[a]ll she ever did was pay them"; and, finally, Hugh Monroe had passed away December 5, 2006, without testifying as to his conversations with Cogswell. Thus,

31

Cogswell demonstrated that the Monroes had failed to provide factual support for their alleged request of higher limits. The burden then shifted to the Monroes to "present substantial evidence, as opposed to mere denial, speculation, or conclusory statements, raising a genuine issue of material fact." *Peterson v. Eichhorn*, 2008 MT 250, ¶ 13, 344 Mont. 540, 189 P.3d 615. Monroes might well have satisfied their burden by presenting an affidavit from Jennifer Webster or other individuals supporting their claim that they asked for higher limits, but they did not do so. Cogswell is thus entitled to summary judgment. Although the Court admits "that a *complete failure* of proof" by Monroes would entitle Cogswell to summary judgment, Opinion, ¶ 34 (emphasis in original), it fails to acknowledge that such failure of proof by the Monroes exists here.

¶64 Correctly applying this summary judgment principle becomes all the more important in light of recent cases. Recently, the Court reversed a district court's dismissal of a case on the pleadings, explaining that the plaintiff should be given the opportunity to prove his case until the point of summary judgment:

> We cannot say beyond doubt that McKinnon can prove no set of facts in support of his claim that would entitle him to relief under these circumstances. At a minimum, the District Court should have afforded McKinnon the opportunity to develop the record through discovery to attempt to show intentional and deliberate action on the part of Western Sugar. *McKinnon's claim may fail at the summary judgment stage if he fails through further discovery to establish sufficient evidence to support his allegations*.

*McKinnon v. Western Sugar Coop. Corp.*, 2010 MT 24, ¶ 20, 355 Mont. 120, 225 P.3d 1221 (emphasis added, citations omitted). If a party must neither plead nor prove his case, then we encourage litigants to withhold their evidence and potentially send every

case to trial—one by ambush. The Court reasons that it is "premature" to conclude that Monroes could not meet their burden at trial, Opinion, ¶ 34, but it is precisely at the summary judgment stage when Monroes must demonstrate that evidence exists to support their claim, or face dismissal. They failed to do so.

¶65    I would affirm.

/S/ JIM RICE


Justice Patricia O. Cotter joins in the concurring and dissenting Opinion of Justice Rice.

/S/ PATRICIA O. COTTER