OLD COLONY INSURANCE COMPANY,
a Corporation, Plaintiff,

v.

JEFFERY'S MILL & WAREHOUSE, Inc.,
a corporation, First Doe, Second Doe,
Third Doe, Fourth Doe, Red & White
Company, a copartnership, and Blue &
Gold Company, a corporation, Defendants.

No. 7078.

United States District Court
N. D. California, N. D.
Nov. 28, 1956.

Thornton & Taylor, E. M. Taylor, E. C. Scoyen, San Francisco, Cal., for plaintiff.

J. A. Montgomery, Jr., Sacramento, Cal., for defendant.

HALBERT, District Judge.

Plaintiff, Old Colony Insurance Company, a corporation, has brought this action as the subrogee of the assured, Taylor-Walcott Company, a copartnership, (hereinafter referred to as Taylor-Walcott) to recover from the defendant, Jeffery's Mill & Warehouse Company, Inc., a corporation, the sum of $37,818.-31 as damages growing out of the loss of certain grain, which was owned by Taylor-Walcott, and which was destroyed by fire while in the defendant's warehouse on September 23, 1953. Plaintiff claims the right to recover this money from the defendant warehouse company on the theory of subrogation. Defendant has challenged plaintiff's right to bring this action as a subrogee, and bases this contention on a clause in the contract of insurance between plaintiff and Taylor-Walcott, which is a form of waiver of the right of subrogation. The disposition of this case rests on the interpretation of that clause as it relates to plaintiff. That clause is paragraph 6(a) of the policy of insurance and reads as follows:

> "It is agreed that the Assured may, prior to a loss, release others from liability for loss or damage to the described property from whatever cause arising; and that all rights of subrogation against any affiliated, associated, or subsidiary concern is hereby waived; nor shall this insurance be prejudiced if the Assured be unable by reason of any agreement entered into prior to a loss, to subrogate to this Company the right of recovery against any party."

Defendant contends *first*, that the assured, Taylor-Walcott, gave it a release from liability at the time the grain in question was stored in defendant's warehouse; and *second*, that the relationship between Taylor-Walcott and defendant was such that the two concerns were "associated" or "affiliated" within the meaning of the above quoted provision.

This case can be set at rest with finality by determination of the second point, so no useful purpose will be served by extending this opinion by a discussion of the first point.

The issue to be resolved is whether defendant's relationship with Taylor-Walcott was such that it came within the meaning of the above provision in the insurance policy, which waives the plaintiff's right of subrogation against *"any affiliated, associated, or subsidiary concern".* Each of the parties agree that defendant was not a subsidiary of Taylor-Walcott, so we must look to the words, "associated" and "affiliated". These words are subject to varying interpretations depending on the respective contexts in which they are found. See: 7 C.J.S., Associate, p. 16; 2 C.J.S., Affiliate, p. 989; 2A Words and Phrases, Affiliate, p. 341; 4 Words and Phrases, Associated, p. 560, and cases cited therein. It must, however, be kept in mind that it is fundamental under California law that where provisions in insurance contracts, which are drafted by the insurance company, create ambiguities that are subject to varying interpretations, any doubts are to be resolved in favor of the insured and against the insurance company. Votaw v. Farmers Automobile Inter-Ins. Exch., 15 Cal.2d 24, 29, 97 P.2d 958, 126 A.L.R. 538, and Miller v. United Insurance Co., 113 Cal.App.2d 493, 499, 248 P.2d 113.

Preliminarily, it will be well to arrive at a definition for the word "associated", and then examine the facts to see what result is reached when this definition is applied to the facts. In Webster's New International Dictionary of the English Language (Second Edition), Unabridged, it is said that "associated" is both the past participle and the participial adjective of the word "associate". In the same volume "associate", the verb, is defined as follows:

■ "To unite in action; to join for a common purpose,"
and "associate", the adjective, is defined as follows:

"Closely connected or joined with some other, as in interest, purpose, action, activity, employment, office, etc."

To summarize from these dictionary definitions, it can be reasonably said that "associated", for the purpose of this case, means: Closely connected or joined in a united action for a common purpose, interest, activity, objective, or the like. This is in line with a good description and definition of the word "associate" found in Weir v. United States, 7 Cir., 92 F.2d 634, at page 638, 114 A.L.R. 481, and as follows:

"The word 'associate' is not of uniform meaning but is, rather, vague in its connotation. In ordinary nomenclature it signifies, to connect closely or join with others in a common purpose, activity, or responsibility, to partake or share in a common design. It implies participation by each of the individuals, so united, in the achievement of a common purpose. In its general and ordinary sense it is said to signify confederacy or union for a particular purpose, good or ill, without any uniform discrimination as to precise meaning."

The above affords a definition for use as a guide, so next the facts must be examined. If those facts disclose a legal association between the defendant and Taylor-Walcott, then plaintiff has no right of subrogation and cannot prevail in this action.

Because of the importance of the facts to this issue, it will be well to review them with care and somewhat in detail. The record in this case reveals that prior to, and/or at the time of the fire:

1. Defendant and Taylor-Walcott had entered into purchase agreements for feed and milled products.

2. Taylor-Walcott had become interested in and encouraged the development of defendant's milling facilities.

3. Mutual agreements were entered into relative to product development and the special treatment of feeds.

4. Defendant and Taylor-Walcott had a mutual agreement relative to a burlap reconditioning plant to be used by the former to supply the needs of the latter.

5. Taylor-Walcott interceded with the University of California on behalf of defendant on an almond hull for feed experiment program.

6. The parties entered into a series of joint venture agreements with respect to the use of almond hulls as feed.

7. Through an agreement Taylor-Walcott was allowed to purchase 100 shares of common stock of defendant, and was given an option to purchase 90 additional such shares.

8. A mutual agreement was made controlling the use of the funds derived from the sale of this stock.

9. Defendant agreed not to issue any additional shares of common stock without the written approval of Taylor-Walcott.

10. Any further alienation of defendant's common stock without the written consent of Taylor-Walcott was restricted by agreement.

11. An exclusive sales agreement was entered into between the two firms.

12. The two firms entered into a further "control" agreement, which restricted defendant's power to borrow in that it required defendant to finance exclusively through Taylor-Walcott.

13. All of defendant's stock was pledged to Taylor-Walcott to secure performance of the various agreements.

14. Two members of Taylor-Walcott were placed on the board of five directors of defendant.

15. Taylor-Walcott was given an equal voice with defendant in the dividend declaration and the inventory valuation policies of defendant.

16. Throughout the seasons of 1951, 1952 and 1953 further joint venture and exclusive sales agreements were entered into by the parties, and provision was made for further financing by Taylor-Walcott.

What result is reached when these facts as a whole are tested by the legal definition of "associated"? The answer is inescapable. The defendant and Taylor-Walcott were *associated* on September 23, 1953.

The facts are that the intimate arrangements between the two concerns were such that Taylor-Walcott was, for all practical purposes, if not in complete fact, placed in control of the defendant. Certainly there can be no dispute that Taylor-Walcott held the guiding and controlling hand in connection with the fundamental policies of the defendant. Nothing not already granted Taylor-Walcott, short of complete ownership, would be needed to give it control of the defendant. If, therefore, it be, as it is argued by plaintiff, that "control" is the test, then even that test has been met in this case. It makes no difference whether the required quantum of control is achieved through controlling stock ownership or by other means; the patent fact remains that defendant not only became "associated" with Taylor-Walcott, but defendant was in fact controlled by Taylor-Walcott as well.

Under the express terms of the contract of insurance between plaintiff and Taylor-Walcott and the facts of this case, plaintiff waived its right of subrogation against the defendant, and cannot prevail in this case.

Let judgment be entered in favor of the defendant. Defendant will prepare and lodge findings of fact and conclusions of law, together with a form of judgment.