DA 12-0519

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 365

LINCOLN COUNTY PORT AUTHORITY,

      Plaintiff and Appellee,

    v.

ALLIANZ GLOBAL RISKS US INSURANCE
COMPANY,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Nineteenth Judicial District,
                In and For the County of Lincoln, Cause No. DV 11-194
                Honorable James B. Wheelis, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Robert J. Phillips (argued), Phillips Haffey PC; Missoula, Montana

          G. Brian Odom, Kerry K. Brown, David B. Winter, Zelle Hofmann Voelbel
          & Mason LLP; Dallas, Texas

          Gary M. Zadick, Ugrin, Alexander, Zadick & Higgins PC; Great Falls,
          Montana

      For Appellee:

          R. Allan Payne (argued), Jacqueline R. Papez, Doney Crowley Payne
          Bloomquist P.C.; Helena, Montana

      For Amicus Curiae:

          Michael W. Sehestedt, General Counsel for the Montana Association of
          Counties; Helena, Montana

                     Argued:  September 20, 2013
                Submitted:  September 25, 2013
                Decided:  December 10, 2013

Filed:

         _____
                         Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1     Appellant Allianz Global Risks US Insurance Company (Allianz) appeals the decision of the Nineteenth Judicial District Court, Lincoln County. The District Court entered summary judgment in favor of Appellee Lincoln County Port Authority (Port) on the issue of whether the Port qualified as an insured under the Allianz insurance policy. The District Court also granted the Port's motion to dismiss Allianz's counterclaim that had sought to reform the insurance policy. We affirm in part, reverse in part, and remand.

¶2     We address the following issues on appeal:

1.     *Whether the Port is an "insured" as contemplated by the Allianz policy.*

2.     *Whether sufficient collateral evidence entitles Allianz to reformation of the policy.*

3.     *Whether the District Court correctly valued the Plywood Plant Building.*

4.     *Whether prejudgment interest began to accrue on the date of the fire at the Plywood Plant Building.*

## PROCEDURAL AND FACTUAL BACKGROUND

¶3     The Montana Association of Counties (MACo) is a nonprofit corporation that acts on behalf of Montana's 56 counties. MACo represents the interests of county governments before the Montana legislature, administrative agencies, and the federal government.

¶4     MACo created a property and liability self-insured risk pool, the Montana Association of Counties Joint Powers Insurance Authority (MACo/JPIA), in the 1980s. Through MACo/JPIA, MACo self-insures its member counties and related entities. MACo/JPIA obtained catastrophic property insurance to supplement its pooled fund of public monies used for self-insurance. The catastrophic insurance serves as excess insurance designed to

2

mitigate MACo's loss on large claims that exceed a designated amount. MACo/JPIA purchased the catastrophic insurance from Allianz to cover damages over $100,000.

¶5 Lincoln County is a MACo member. Lincoln County created the Port as a separate public body pursuant to § 7-14-1104, MCA. The Port seeks to foster economic development in Lincoln County through its operation of an industrial facility in Libby, Montana. The industrial facility consists of several buildings associated with a former lumber mill. The lumber mill includes a Plywood Plant Building. The Port insured the Plywood Plant Building, along with its other buildings at the lumber mill, through the MACo/JPIA self-insured risk pool.

¶6 Part of the roof of the Port's Plywood Plant Building collapsed from heavy snow during the winter of 2007-2008. The Port submitted an insurance claim for damages caused by the collapse of the roof. Allianz assessed the damage to the Plywood Plant Building at 29% of its value. Allianz paid the Port over $3 million for the loss of this portion of the Plywood Plant Building consistent with its coverage obligations under the catastrophic insurance policy with MACo/JPIA.

¶7 MACo/JPIA thereafter informed the Port in a June 24, 2008, letter that it no longer would insure the Plywood Plant Building. The 2009-2010 schedule of insured locations omitted the Plywood Plant Building. This omission coincided with the Port's decision to demolish the part of the Plywood Plant Building that had collapsed due to the heavy snowfall. The Port intended to renovate the part of the Plywood Plant Building that remained standing after the roof collapsed.

3

¶8    The Port was in the process of demolishing the damaged part of the Plywood Plant Building when a fire destroyed the building entirely on February 25, 2010. The Port submitted an insurance claim for damages caused by the fire to the Plywood Plant Building. MACo/JPIA and Allianz refused to cover this loss. The Port filed this suit against Allianz.

¶9    The District Court granted summary judgment in favor of the Port. The District Court determined that the Allianz policy insures the Port and ordered the parties to conduct appraisal proceedings. The District Court also granted the Port's motion to dismiss Allianz's counterclaim that had sought to reform Allianz's policy to exclude coverage of the Plywood Plant Building.

¶10   During the following appraisal, the parties disagreed whether the valuation provision in Allianz's policy limited the Port's recovery for that portion of the Plywood Plant Building that had been slated for demolition to the increased cost of demolition. The District Court issued an order on May 22, 2012, that clarified that the valuation provision did not apply in appraisal proceedings.

¶11   The District Court entered its final judgment on July 31, 2012. The District Court awarded a principal amount of $6,060,980 based on the findings of the appraisal panel and the parties' stipulation to the value of certain other damages, $1,474,560 in prejudgment interest beginning on the date of the fire, and $2,511,847 in attorneys' fees and costs. The total award with fees and interest now exceeds $10 million.

## STANDARD OF REVIEW

¶12   We review de novo a district court's ruling on a motion for summary judgment. *Bailey v. State Farm Mut. Auto. Ins. Co.*, 2013 MT 119, ¶ 18, 370 Mont. 73, 300 P.3d 1149.

4

We review de novo a district court's ruling on a M. R. Civ. P. 12(b)(6) motion to dismiss. *White v. State*, 2013 MT 187, ¶ 15, 371 Mont. 1, 305 P.3d 795. We review for correctness a district court's legal determination. *N. Cheyenne Tribe v. Roman Catholic Church*, 2013 MT 24, ¶ 21, 368 Mont. 330, 296 P.3d 450.

## DISCUSSION

¶13 *Whether the Port is an "insured" as contemplated by the Allianz policy.*

¶14 The Port argues that it qualifies as an insured under the Allianz policy's definition. The Port claims that the policy's definition of "insured" includes the MACo counties and any other entities that receive insurance through MACo/JPIA. Allianz argues that it intended this language to cover only MACo and MACo/JPIA.

¶15 We begin our analysis by examining the insurance contract's plain language. We will not rewrite clear and explicit language in an insurance contract. *Monroe v. Cogswell Agency*, 2010 MT 134, ¶ 15, 356 Mont. 417, 234 P.3d 79. We interpret an insurance contract's terms "according to their usual, common sense meaning," that is, how they would be understood by "a reasonable consumer of insurance products." *Steadele v. Colony Ins. Co.*, 2011 MT 208, ¶ 18, 361 Mont. 459, 260 P.3d 145.

¶16 The Allianz policy defines the "insured" as MACo "and its subsidiary, associated or allied company, corporation, firm, organization." All of the terms used by Allianz describe one single entity, not multiple entities. The language of the contract would lead us to believe that the policy's definition of "insured" covers only MACo and one other entity, presumably MACo/JPIA. *Steadele*, ¶ 18.

5

¶17    This understanding of "insured," however, cannot be reconciled with other provisions in the Allianz policy. We construe an insurance policy in accordance with the entirety of its terms and conditions. *Lambert Well Serv. v. Wellington Specialty Ins. Co.*, 2008 MT 212, ¶ 11, 344 Mont. 204, 186 P.3d 1255. In other words, we read the Allianz policy as a whole and attempt to reconcile its various parts to give the entire policy meaning and effect. *Lambert*, ¶ 11.

¶18    The Allianz policy defines "insured property" to include real property and personal property. The personal property covered by the policy includes personal property of the following type: (1) "owned by the Insured," (2) "of officers and employees of the Insured," and (3) "of others in the Insured's custody." The substitution of "MACo and MACo/JPIA" for the term "insured" in each of these provisions would undermine the policy's definition of "insured property." MACo counties and other associated entities owned the personal property insured by the policy. MACo or MACo/JPIA did not own the personal property in question. MACo's or MACo/JPIA's employees did not own the personal property in question. And none of the personal property contemplated by the policy resided in the custody of MACo or MACo/JPIA.

¶19    We note further that portion of the policy that sets forth the action to be taken in the event of a loss. The policy obligates the insured to protect the subject property from further loss or damage. The insured also must provide an inventory of lost, destroyed, or damaged items. MACo lacks the ability to undertake the protection of the insured's properties or to prepare inventories of lost, destroyed, or damaged items. The owner of the property in question undertakes these duties.

6

¶20    The use of "insured" under the policy's discussion of "insured property" and "requirements in case of loss" conflict with Allianz's claim that only MACo and MACo/JPIA qualify as insureds under the policy. These provisions of the policy raise ambiguities. We must reconcile these seemingly contradictory provisions to give meaning and effect to the entire policy. *Lambert*, ¶ 11. The disconnect between the policy's definition of "insured" and its definition of "insured property" and "requirements in case of loss" creates ambiguity regarding the policy's definition of "insured." This ambiguity requires us to look beyond the plain language of the Allianz policy's definition of "insured."

¶21    We consider extrinsic evidence to interpret this ambiguous provision and determine who qualifies as an intended "insured" under the policy. *Estate of Irvine v. Oaas*, 2013 MT 271, ¶ 22, 372 Mont. 49, 309 P.3d 986 (allowing a court to consider extrinsic evidence when it interprets a contract that contains ambiguous terms). The extrinsic evidence demonstrates that MACo exists for the express purpose of serving as a single entity to represent Montana's counties, including Lincoln County, before the Montana legislature, administrative agencies, and the federal government. MACo has no existence separate from the collection of Montana counties that comprise its membership.

¶22    Lincoln County created the Port pursuant to § 7-14-1104, MCA. Section 7-14-1104 provides that the Port's purpose involves "public and governmental functions." These governmental functions include promoting economic development. Section 7-14-1104(1), MCA. Subsection 2 further authorizes the Port to use any property that it owns as security to issue bonds "for an essential public and governmental purpose." Section 7-14-1104(2),

7

-1133(4), MCA. This statute indicates that the Port, as a subunit of Lincoln County, exists in "associat[ion] or alli[ance]" with Lincoln County.

¶23 The fact that the Port qualified for insurance through the MACo/JPIA insurance pool in the first place further suggests an "associat[ion] or alli[ance]" between the Port and MACo. The Port submitted its insurance applications, information, and premium payments to MACo/JPIA, similar to any other MACo/JPIA-member county. MACo/JPIA processed the Port's application and readily accepted its premium payment. MACo/JPIA, one of MACo's insurance pools, serves as an extension of MACo. The Port's interactions with MACo/JPIA support the Port's claim of its "associat[ion] or alli[ance]" with MACo pursuant to the terms of the Allianz policy.

¶24 Additionally, MACo/JPIA admitted to having adopted the language for its own property insurance policy form directly from the Allianz insurance policy form. MACo/JPIA and Allianz used insurance policy forms with identical language. MACo/JPIA conceded that it insured the Port's property. The Port's satisfaction of the definition of "insured" under MACo/JPIA's policy suggests that the Port also would satisfy the definition of "insured" under the same language as used in the Allianz policy.

¶25 "Associated" as used in insurance policies often connotes entities closely joined with others in a common purpose. *Old Colony Ins. Co. v. Jeffery's Mill & Warehouse, Inc.*, 146 F. Supp. 277, 279 (N.D. Cal. 1956). "Associated" further implies "participation by each of the individuals . . . in the achievement of a common purpose." *Old Colony Ins. Co.*, 146 F. Supp. at 279. The Port performs public and governmental functions that include economic development in Lincoln County. Section 7-14-1104, MCA. Lincoln County, a political

8

subdivision of Montana, created the Port to allow it to pursue these public and governmental functions related to economic development in Lincoln County. The Port and Lincoln County share the common purpose of performing public and governmental functions directly for the benefit of the residents of Lincoln County. The Port and Lincoln County each participate in the achievement of this common purpose.

¶26 The Port operates under the auspices of Lincoln County. Section 7-14-1104, MCA. Lincoln County, along with other counties in Montana, in turn, created MACo to represent the interests of its member counties. MACo, too, operates under the auspices of Lincoln County and its other member counties as MACo performs its functions directly for the benefit of Lincoln County and its other member counties. These relationships comport with the common purpose and participation contemplated by the Court in *Old Colony Ins. Co.*, 146 F. Supp. at 279.

¶27 The Court in *Travelers Indem. Co. v. United States*, 543 F.2d 71, 76 (9th Cir. 1976), explained that "affiliated" and "associated" as used in an insurance policy should be interpreted "to make them applicable to persons, things, or entities of the same general nature or class" as those entities owned or controlled by the insured. The court relied on this analysis to reject a claim by the United States, acting through the Bonneville Power Administration (BPA), that a subrogation waiver clause in an insurance contract shielded it from subrogation efforts by an insurer for a private electric power company. *Travelers*, 543 F.2d at 73. The insurer sought subrogation from BPA following an explosion at a power generation facility operated by BPA that had destroyed the private company's property. *Travelers*, 543 F.2d at 73-74. The Court determined that, as a governmental entity, BPA had

9

"objectives and responsibilities apart from those of private power companies." *Travelers*, 543 F.2d at 76.

¶28 The Port and Lincoln County perform public and governmental functions. Section 7-14-1104, MCA. MACo promotes the effective operation of its members—local political subdivisions. Entities of the same general nature possess similar responsibilities as contemplated by subrogation waiver clauses. *Travelers*, 543 F.2d at 76. Extrinsic evidence leads us to conclude that the Port and Lincoln County would fit within the scope of entities of the same general nature as MACo as all three exist to promote county governmental functions.

¶29 Further analysis of the policy also leads us to conclude that the Allianz policy does not constitute reinsurance. A policy of reinsurance with the Port, as an "original insured," generally would bar the Port from bringing a direct claim against Allianz as a mere "reinsurer." *See* Steven Plitt, Daniel Maldonado & Joshua D. Rogers, *Couch on Insurance* vol. 1A, § 9:30 (3d ed., West 2010) [hereinafter *Couch on Insurancy*]. The evidence instead suggests that Allianz simply provided an excess carrier high-deductible plan for the MACo/JPIA self-insurance pool.

¶30 MACo/JPIA's authorizing statute provides that political subdivisions that elect to procure insurance pursuant to the section "may obtain *excess coverage* from a surplus lines insurer." Section 2-9-211(1), MCA (emphasis added). The statute indicates that the political subdivisions themselves would be the insured under any excess coverage policy. The joint powers agreement that established MACo/JPIA further supports this proposition. The agreement provides that member counties decided to create a joint risk-sharing pool to self-

10

insure and "to purchase catastrophe, excess and/or aggregate stop loss insurance when deemed prudent." Section 2-9-211(1), MCA, authorizes this type of insurance arrangement.

¶31 The operation of the joint-insurance pool also supports the notion that Allianz provided excess insurance. MACo/JPIA listed Allianz as an insurer on the declarations page of the Port's policy. The Port negotiated directly with Allianz in handling an earlier claim. All of these items of extrinsic evidence offer further indicia that Allianz served as an excess insurance carrier, rather than as a reinsurer. Allianz's status as an excess insurance carrier normally would allow the Port to bring a claim directly against Allianz as an insured. *See Tex. Dept. of Ins. v. Am. Nat'l Ins. Co.*, 55 Tex. Sup. J. 705 (Tex. 2012) (providing that excess insurance represents "an agreement to indemnify against any loss that exceeds the [insured's] amount of primary or other coverage").

¶32 The Port would not necessarily be precluded from bringing a claim against Allianz even if Allianz had served as a reinsurer. The record indicates that the Port dealt directly with Allianz when the Plywood Plant Building's roof collapsed. Consistent direct contact between an original insured (the Port) and a reinsurer (Allianz) may waive a reinsurer's right to immunity from being sued by an original insured. *Allstate Ins. Co. v. Administratia Asigurarilor De Stat*, 948 F. Supp. 285, 307-08 (S.D.N.Y. 1996); *Couch on Insurance* at § 9:30.

¶33 We must construe ambiguous language in a contract against the contract's drafter. *Mary J. Baker Revocable Trust v. Cenex Harvest States, Coops., Inc.*, 2007 MT 159, ¶ 34, 338 Mont. 41, 164 P.3d 851. Allianz drafted the policy. We construe against Allianz the Allianz policy's use of "associated or allied" when combined with the policy's discussion of

11

"insured property" and "requirements in case of loss." *Mary J. Baker*, ¶ 34. We agree with the District Court's determination that the Port qualifies as an insured under the terms of the Allianz policy.

¶34   *Whether sufficient collateral evidence entitles Allianz to reformation of the policy.*

¶35   Allianz argues that Allianz and the Port both understood that the Allianz policy would not cover the Plywood Plant Building. Allianz relies primarily upon the notice from MACo/JPIA to the Port that the Plywood Plant Building no longer would be insured. Allianz seeks to reform the contract to conform to what it describes as the parties' original intent. Allianz seeks to add language to the Allianz policy that specifically would exclude the Plywood Plant Building from any coverage.

¶36   The District Court determined that § 33-15-302, MCA, prohibits reformation of insurance policies. The Port suggests that we need not determine whether § 33-15-302, MCA, bars reformation of an insurance contract as reformation cannot be used to correct an unforeseen legal effect of an insurer's policy. The Port underscores that the Allianz policy provides insurance for any "location" listed on the latest schedule. The policy also provides that "[i]nsured [l]ocation(s) includes the area within one thousand (1,000) feet of such 'location.'" The Plywood Plant Building sat within 1,000 feet of an insured building included on the schedule of insured locations.

¶37   We will revise a contract when, through fraud, mutual mistake of the parties, or a mistake of one party which the other at the time knew or suspected, a written contract does not truly express the intention of the parties. *Thibodeau v. Bechtold*, 2008 MT 412, ¶ 22, 347 Mont. 277, 198 P.3d 785 (citing § 28-2-1611, MCA). To obtain judicial reformation, the

12

parties must have reached a mutual understanding and executed a written contract in furtherance of that understanding, but made a mistake incorporating the understanding that they had reached into the contract that they executed. *Thibodeau*, ¶ 22.

¶38 The record makes Allianz's and the Port's intent clear: to exclude the Plywood Plant Building, and only the Plywood Plant Building, from coverage under the 2009-2010 Allianz policy. Allianz had paid coverage for the Plywood Plant Building following the collapse of the roof in 2008. Allianz canceled coverage for the Plywood Plant Building after the roof's collapse.

¶39 The Trust Administrator for MACo/JPIA attested that "MACo/JPIA [had] sent a letter to Tom Wood, the local insurance agent, cancelling property coverage and premise liability coverage for the Plywood Plant *Building*." (Emphasis added). MACo/JPIA subsequently informed the Port in writing on June 24, 2008, that the "[p]roperty and [l]iability coverage for the Plywood [P]lant [B]*uilding* for the Lincoln Port Authority . . . is cancelled effective July 1, 2008." (Emphasis added). This letter mentions only the Plywood Plant *Building*.

¶40 Thomas Wood (Wood), the owner of the insurance agency that had helped the Port obtain insurance coverage, forwarded another copy of MACo/JPIA's letter to the Port with his own cover letter on June 26, 2008. Wood attested in his affidavit that his letter had "advis[ed the Port] that there were no other insurance markets that would insure the Plywood Plant *Building*." (Emphasis added). Wood further attested that the Port prepared a "revised S.O.V. [Statement of Values] removing the Plywood Plant *Building*" that was "[b]ased on MACo/JPIA's advisement that it would no longer insure the Plywood Plant *Building*." (Emphasis added).

13

¶41 The Port understood that no coverage existed for the Plywood Plant Building, and acted accordingly. The Port submitted a Statement of Values following the notice of canceled coverage under the 2009-2010 Allianz Policy. The Port's Statement of Values included each building that had been in the prior Statement of Values with the specific omission of the Plywood Plant Building. This sole omission clarified the Port's understanding of the canceled coverage under the 2009-2010 Allianz Policy.

¶42 Publicity surrounding the fire that destroyed the Plywood Plant Building is further informative. The *Missoulian* reported the Port's belief on February 26, 2010, that "the *building itself* was not insured . . . 'ever since the snow collapsed parts of the roof, the insurance company dropped us.'" (Emphasis added). Libby's *The Western News* reported the industrial site manager's statement on March 8, 2010, that "the industrial site's insurance on the *building* had been dropped when the company paid a $3.2 million settlement after the roof collapsed two years ago." (Emphasis added). The record makes clear that the parties mutually understood that coverage for the Plywood Plant Building, and only the Plywood Plant Building, no longer existed. *Thibodeau*, ¶ 22.

¶43 The parties created a revised contract based upon their shared understanding. The 2009-2010 Allianz policy incorporated the Port's revised Statement of Values, which specifically had excluded the Plywood Plant Building from the schedule of covered properties. The revised schedule of covered properties in the 2009-2010 Allianz policy represents the parties' incorporation of their mutual understanding into the writing. *Thibodeau*, ¶ 22. Allianz now claims, however, that both parties also intended the Allianz

14

policy to exclude coverage of the area within the 1,000 foot radius of other buildings. We disagree.

¶44    The record contains no indication that either Allianz or the Port intended to exclude coverage of the area within the 1,000 foot radius of other covered buildings, regardless of what that area contained. The parties agreed that the Plywood Plant Building itself would no longer be covered. They did not agree that any salvage materials located within 1,000 feet of other covered buildings would not be covered. The parties reached a mutual understanding that Allianz no longer would cover the Plywood Plant Building, and only the Plywood Plant Building. The parties committed that understanding to writing in the 2009-2010 Allianz policy.

¶45    The evidence in the record upon which Allianz relies to argue for reformation to exclude the 1,000 foot radius fails to indicate any intent to exclude that radius. Allianz relies heavily upon the facts that the Port did not include the Plywood Plant Building in the Statement of Values and that the Port did not pay any premium to Allianz for the Plywood Plant Building. The Port undertook both of these actions, however, in furtherance of its understanding that Allianz would not provide coverage for the Plywood Plant Building in the 2009-2010 Allianz policy.

¶46    Allianz does not identify any other evidence in the record that would indicate the parties' mutual intent to exclude the 1,000 foot radius. Allianz has failed to establish that the 2009-2010 insurance policy expressed anything other than what the parties mutually had intended. We decline to reform the 2009-2010 Allianz policy.

15

¶47     We need not reach Allianz's arguments that Montana law allows reformation of an insurance policy. Reformation as a contract remedy remains available only in those situations where a discrepancy exists between the understanding that parties reached and the contract that they executed. *Thibodeau*, ¶ 22. The absence of a discrepancy eliminates reformation as a remedy. *Thibodeau*, ¶ 22.

¶48     In the absence of a discrepancy, "the language of a contract governs its interpretation if that language is clear and explicit." *Heggem v. Capitol Indem. Corp.*, 2007 MT 74, ¶ 22, 336 Mont. 429, 154 P.3d 1189 (citing § 28-3-401, MCA). The Port and Allianz each agreed to a contract that specified that "[i]nsured [l]ocation(s) include[] the area within one thousand (1,000) feet of such 'location,'" referring to any location listed in the 2009-2010 schedule of coverage. The Port paid a premium to Allianz in order to receive this 1,000-foot coverage under Allianz's policy. Neither party disputes that the remnants of the Plywood Plant Building fall squarely within the 1,000-foot radius covered by Allianz's policy. The language in the 2009-2010 Allianz policy clearly and explicitly indicates that Allianz will provide coverage to the area within 1,000 feet of any covered location. Allianz must provide that coverage. The language of the Allianz policy provides the Port with coverage for the remnants of the Plywood Plant Building.

¶49     The Dissent posits that the parties never intended for the general provision that insures property within 1,000 feet of an insured location to cover locations deleted from coverage. (J. Rice Dissenting, ¶ 73.) Allianz would not need to seek reformation if the policy clearly stated as much. The fact that Allianz seeks reformation of the policy represents a tacit acknowledgment that the policy as written covers the Plant remnants. The Dissent further

16

maintains that under this Court's interpretation, coverage for a particular property never could be deleted unless the parties rewrote the policy. Any required rewrite would be simple and easily applied along the following lines: "Insured Location(s) includes the area within one thousand (1,000) feet of such 'location,' *unless the location for which recovery is sought specifically has been deleted from coverage.*"

¶50 Perhaps Allianz neglected to change its policy to reflect its apparent belief that the Plywood Plant Building would not be covered under any circumstances. Equity does not require us "to reform a contract to correct an error . . . when due diligence would have uncovered and corrected the error." *Martin v. Crown Life Ins. Co.,* 202 Mont. 461, 469, 658 P.2d 1099, 1104 (1983). The defendant in *Martin*, an insurance company, waited more than a year to correct an error that it had made in its insurance policy and certificate of insurance. *Martin*, 202 Mont. at 469, 658 P.2d at 1103. We refused to reform the contract to correct the insurance company's mistake in the absence of its own due diligence. *Martin*, 202 Mont. at 469, 658 P.2d at 1104.

¶51 Allianz, too, waited more than a year to modify its policy to eliminate any ambiguity whether it covered the Plywood Plant Building as being located within 1,000 feet of an insured building. Allianz's exercise of due diligence should have discovered any error in the content of its insurance policy. Allianz has failed to establish that its insurance policy expressed something other than what the parties mutually had intended.

¶52 *Whether the District Court correctly valued the Plywood Plant Building.*

¶53 The District Court ordered Allianz and the Port each to select an appraiser to determine how much Allianz owes the Port under the policy. Allianz argues that the

17

adjustment procedure in the valuation section of its policy should have guided the appraisers in determining the amount of loss that the Port should receive. The adjustment procedure in section 10(f) addresses property scheduled for demolition. Allianz maintains that section 10(f) limits the Port's recovery to the "increased cost of demolition" for the portion of the Plywood Plant Building that the Port had slated for demolition.

¶54    The section of Allianz's policy that addresses appraisal does not require appraisers to follow Allianz's valuation scheme. Indeed, the section provides no limitations on the valuation of property scheduled for demolition. The valuation provision for property scheduled for demolition applies only when the parties agree on the amount of loss. The valuation provision has no relevance when the parties agree to submit their valuation to an appraiser.

¶55    The fact that the appraisers do not have to follow the Allianz policy's adjustment procedures does not relieve their valuation of the Plywood Plant Building of all restrictions. Allianz's policy stipulates that appraisers will determine the amount of loss based upon "actual cash value" and "replacement cost." Allianz's policy defines "actual cash value" as the cost of replacement minus depreciation. Allianz's policy dictates that the insured shall receive "actual cash value" if an insured fails to repair or replace its damaged property within two years. An insured receives "replacement cost" only if the insured repairs or replaces within two years.

¶56    The parties disagree whether the Port should receive "replacement costs" for those portions of the Plywood Plant Building that the Port had slated for demolition. This disagreement revolves around the $1,925,000 that the appraisers have determined represents

18

the "replacement cost" for those portions of the Plywood Plant Building that had been slated for demolition.

¶57   The District Court allowed the Port to choose "replacement cost" even for those portions of the Plywood Plant Building that the Port had slated for demolition. The District Court waived the requirement in the policy that the Port had to repair or replace the damaged building within two years. This two-year repair window had lapsed since the 2010 fire. The District Court relied on the fact that Allianz's wrongful denial of coverage had stymied any efforts by the Port to rebuild.

¶58   The District Court cited numerous cases to support its determination.   The cases focus on the fact that insurers' refusals to pay recovery to their insureds prevented the insureds from repairing or replacing as the insureds lacked sufficient money for such efforts. *See Zaitchick v. American Motorists Ins. Co.*, 554 F. Supp. 209, 217 (S.D.N.Y. 1982), *aff'd*, 742 F.2d 1441 (2d Cir. 1983); *Columbia Mut. Ins. Co. v. Sanford*, 920 S.W.2d 28, 30 (Ark. App. 1996); *Pollock v. Fire Ins. Exch.*, 423 N.W.2d 234, 236-37 (Mich. App. 1988).   In two of the cited cases—*Conrad Bros. v. John Deere Ins. Co.*, 640 N.W.2d 231, 242 (Iowa 2001) and *Bailey v. Farmers Union Coop. Ins. Co.*, 498 N.W.2d 591, 598-99 (Neb. App. 1992)— courts determined that the insured parties would have rebuilt, *but for* repudiation of their policies by their insurers.

¶59   The Port never intended to rebuild the damaged portions of the Plywood Plant Building before the 2010 fire. The Port received over $3 million for the damage to the Plywood Plant Building after the roof collapsed during the winter of 2007-2008. The Port in

19

fact affirmatively intended to demolish those portions of the Plywood Plant Building that had been damaged from the roof collapse before the 2010 fire.

¶60 The Port apparently did not replace or repair any portions of the Plywood Plant Building that had been slated for demolition within two years of the fire. The Port would receive far more for the Plywood Plant Building than it had contemplated under the policy if we allow the Port to elect to receive "replacement cost" for those portions of the Plywood Plant Building that it had not intended to repair or replace.

¶61 Property insurance serves to place the insured in the same position in which he would have been had there been no loss. *See Lee v. Providence Wash. Ins. Co.*, 82 Mont. 264, 276, 266 P. 640, 644 (1928). The Port would land in a better place than it would have without the fire if we allow the Port to receive "replacement cost" for those portions of the Plywood Plant Building that it had slated for demolition. The Port should receive only "actual cash value" for those portions of the Plywood Plant Building that it had slated for demolition. Most likely "actual cash value" for those portions of the Plywood Plant Building that the Port had slated for demolition will amount only to salvage value as these portions of the building have depreciated greatly. We reverse the District Court's determination that the Port should receive "replacement cost" for the portions of the Plywood Plant Building that had been slated for demolition.

¶62 *Whether prejudgment interest began to accrue on the date of the fire at the Plywood Plant Building.*

¶63 The Port seeks to recover interest, pursuant to § 27-1-211, MCA, from the date of the fire that destroyed the Plywood Plant Building. Section 27-1-211, MCA, allows an insured

20

party to recover interest under certain circumstances. A party must fulfill three prerequisites: (1) "an underlying monetary obligation must exist," (2) "the amount of recovery must be capable of being made certain," and (3) "the right to recover must vest on a particular day." *Mont. Petroleum Tank Release Comp. Bd. v. Crumleys, Inc.*, 2008 MT 2, ¶ 99, 341 Mont. 33, 174 P.3d 948.

¶64 Conversely, an award of prejudgment interest would not be available "when the amount of a party's damages is uncertain or disputed." *Crumleys*, ¶ 99. The insurer in *Crumleys* had breached its duty to indemnify its insured's loss that had resulted from a leak in an underground diesel tank. *Crumleys*, ¶ 1. The parties could not ascertain the amount of damages that had occurred as a result of the breach until the date that the jury returned a verdict and awarded damages. *Crumleys*, ¶ 100. Under those circumstances, "no interest can run until a fixed amount of damages has been arrived at, either by agreement, appraisal, or judgment." *Crumleys*, ¶ 100 (quoting *Northern Mont. Hosp. v. Knight,* 248 Mont. 310, 321, 811 P.2d 1276, 1282 (1991)).

¶65 Allianz disputed whether it insured the Plywood Plant Building from the time that the Port submitted its claim. The amount of damages remains uncertain. The complexity of this case prevents the Port from invoking § 27-1-211, MCA, in order to argue that prejudgment interest should have begun to accrue on the date of the fire.

¶66 The Port argues alternatively that § 27-1-312, MCA, not § 27-1-211, MCA, controls the outcome. Section 27-1-312, MCA, provides that the "detriment caused by the breach of an obligation to pay money only is deemed to be the amount due by the terms of the

21

obligation with interest thereon." The "amount due by the terms of the obligation" in this case remains, however, far from clear.

¶67    We agree that Allianz must pay interest. The language of both § 27-1-211, MCA, and § 27-1-312, MCA, indicates that Allianz must pay interest on the amount that it owes the Port. Section 27-1-312, MCA, remains silent as to the date on which interest should begin to accrue. Section 27-1-312, MCA, refers to "the amount due by the terms of the obligation." Section 27-1-312, MCA, provides no guidance regarding timing. On the other hand, § 27-1-211, MCA, entitles a party to recover damages once they are "certain or capable of being made certain by calculation." We must rely on § 27-1-211, MCA, to determine *when* interest began to accrue on the amount of damages that Allianz must pay to the Port.

¶68    The date of the fire cannot mark the date that interest began to accrue. *See Crumleys*, ¶ 99. The amount of damages remained incapable of being made certain by calculation at the time of the fire. A numerical amount for damages actually must be calculated, or be capable of calculation, before interest can begin to accrue. Section 27-1-211, MCA; *see also*, *Northern Mont. Hosp.*, 248 Mont. at 320-21, 811 P.2d at 1282. For example, in *Northern Montana Hospital* we determined that the right to recover interest vested only on the date that the jury returned a verdict for the monetary amount of $1,750,000. *Northern Mont. Hosp.*, 248 Mont. at 321, 811 P.2d at 1282. Here, the parties could not agree on how the appraisers should calculate the damages. No amount could be assigned for the damages to the portion of the Plywood Plant Building that the Port had slated for demolition.

¶69    The District Court on remand will determine the amount of damages that Allianz owes the Port for those portions of the Plywood Plant Building that had been slated for

22

demolition. The damages at that point will be "capable of being made certain by calculation." Section 27-1-211, MCA. The Port will receive "actual cash value" for the portions of the Plywood Plant Building that it had slated for demolition. The appraisers can calculate this value. The District Court's adoption of the appraiser's new valuation on remand will mark the point at which interest shall begin to accrue. The Port's loss entitles it to post-judgment interest, but not prejudgment interest for those portions of the Plywood Plant Building that had been slated for demolition. Section 27-1-211, MCA.

## CONCLUSION

¶70 We affirm the District Court's determination that Allianz's policy provides coverage for the Plywood Plant Building based upon its location within 1,000 feet of a covered building. We also affirm the District Court's refusal to reform the Allianz policy. We reverse, however, the District Court's award of "replacement cost" for those portions of the Plywood Plant Building that the Port had slated for demolition. We further remand to allow the District Court to calculate post-judgment interest owed to the Port for the damages owed under the policy.

¶71 Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

/S/ BRIAN MORRIS

We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER

23

Justice Jim Rice, dissenting.

¶72    I agree with the Court that the parties clearly intended to exclude the Plywood Plant Building from coverage, clearly acted to implement this intention, and that the consequence of their action was that coverage for the Building "no longer existed." Opinion, ¶ 42. However, I disagree with the Court's further conclusion that the parties nonetheless did not exclude "*the remnants of* the Plywood Plant Building" from coverage—as if the remnants of the Building somehow acquired a different character than the Building itself, a conclusion for which no support is offered. Opinion, ¶ 48 (emphasis added). Thomas Wood's June 26, 2008 letter advised the Port "that there is NO COVERAGE (property or liability) on the old plywood plant *location*" (caps in original, italics added). Following the cancellation of coverage, the Port's property insurance premium went down from $19,210 to $7,004. Thus, there was no consideration for coverage for the Building. The Court declares Allianz to be an excess insurer, Opinion, ¶ 31, but there can be no excess coverage if there was no consideration for primary coverage. I disagree with the District Court's conclusion that an insurance contract cannot be reformed. Although we should affirmatively declare that there was no coverage at all because of the failure of consideration, Allianz is at least entitled to reformation of the contract to conform it to the parties' clear intentions.

¶73    I further disagree that the parties' specific action to delete the Building from coverage was counteracted by the general provision insuring property within 1,000 feet of an insured location, and that it was legally impossible to delete coverage for a particular building unless Allianz "change[d] its policy to reflect its apparent belief that the Plywood Plant Building

24

would not be covered under any circumstances." Opinion, ¶ 50. Under the Court's policy interpretation, coverage for a particular property could never be deleted unless the policy was rewritten. This lacks any sense.

¶74 I would reverse and enter judgment for Allianz.

/S/ JIM RICE

Justice Beth Baker joins in the dissenting Opinion of Justice Rice.

/S/ BETH BAKER

Justice Laurie McKinnon, dissenting.

¶75 I dissent from the decision of the Court holding that the Lincoln County Port Authority (Port) was an insured party under the terms of the Allianz policy. The plain, unambiguous language of the Allianz policy does not include the Port as an insured party. Nevertheless, the Court concludes that the policy is ambiguous and moves on to an analysis of the extrinsic evidence. In so doing, the Court mischaracterizes the relationship between the Montana Association of Counties (MACo) and the Port. The result reached by the Court disregards the general intent of the contract and is supported by neither the facts nor the law.

¶76 When this Court is asked to interpret a written contract, "the intention of the parties is to be ascertained from the writing alone if possible . . . ." Section 28-3-303, MCA. As the Court observes, the plain language of the Allianz policy identifies the insured as MACo "and its subsidiary, associated or allied company, corporation, firm, [or] organization." Opinion, ¶ 16. The use of the singular form of "subsidiary, associated or allied company, corporation,

25

firm, [or] organization" indicates that the parties contemplated only one such associated or allied entity, specifically, Montana Association of Counties Joint Powers Insurance Authority (MACo/JPIA). Opinion, ¶ 16. The plain language definition of "insured" in the Allianz policy clearly indicates that the parties did not intend each of the counties and special districts insured by MACo/JPIA to be named as insured in the Allianz policy.

¶77 Had the parties intended for each county or public entity to be insured directly by Allianz, the policy itself provided a clear way of expressing this intent. The policy includes separate designations for "Insured" and "First Named Insured" parties. The "First Named Insured" bears responsibility for payment of premiums and is authorized to cancel the policy. The parties could, therefore, have listed the Port and other entities insured by MACo/JPIA as the "Insured" on the Allianz policy and designated MACo as the "First Named Insured" responsible for management of the policy. The parties did not do so, and instead chose to designate MACo as both the "Insured" and the "First Named Insured." The contract, on its face, evidences the parties' intent to name only MACo and its single associated entity, MACo/JPIA, as the insured.

¶78 The Court concludes that the policy's definition of insured personal property is ambiguous, and therefore proceeds to consider extrinsic evidence of the parties' intent. Opinion, ¶¶ 20-21. This Court has not been asked to construe the policy as applied to personal property, however, and the Court disregards completely the definition of insured real property. The policy's definition of insured real property is unambiguous and fully consistent with the designation of MACo and MACo/JPIA as the named insured. The Allianz policy states that the insured property includes "[r]eal property in which the Insured

26

has an insurable interest." An insurable interest in property is "any actual, lawful, and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage or impairment." Section 33-15-205(2), MCA. An insurable interest need not be an ownership or possessory interest. Rather, "any person has an insurable interest in property, by the existence of which he will gain an advantage, or by the destruction of which he will suffer a loss . . . ." *Harrison v. Fortlage*, 161 U.S. 57, 65, 16 S. Ct. 488, 490 (1896); *Atlas Assurance Co. v. Harper, Robinson Ship. Co.*, 508 F.2d 1381, 1386, (9th Cir. 1975); *Bird v. Central Mfrs. Mut. Ins. Co.*, 168 Ore. 1, 6, 120 P.2d 753, 755 (1942) ("It is sufficient to constitute an insurable interest in property that the insured is so situated with reference to the property that he would be liable to loss should it be injured or destroyed by the peril against which it is insured."). As an insurer of the Port, MACo/JPIA was financially liable for losses resulting from the destruction of property owned by the Port. Therefore, MACo/JPIA had an insurable interest in real property owned by the Port. Section 33-15-205(2), MCA. The policy's clear designation of MACo and MACo/JPIA as the insured parties is fully consistent with the policy's definition of insurable real property. The terms require no additional interpretation.

¶79 The Court also concludes that the duties to be undertaken by the insured in the event of a loss are inconsistent with a reading of MACo and MACo/JPIA as the insured. Opinion, ¶ 19. The policy requires the insured to protect the property from further loss or damage and to provide an inventory of lost or damaged property. The Court concludes, with no analysis, that MACo and MACo/JPIA lack the ability to undertake these duties. Opinion, ¶ 19. The Joint Powers Agreement establishing MACo/JPIA, however, authorizes MACo/JPIA to

27

"establish reasonable and necessary loss reduction and prevention procedures to be followed by the members" and to "provide risk management and claim adjustment." Members are obligated to allow MACo/JPIA "reasonable access to all premises of the member and all member records." Members must also "cooperate fully" with MACo/JPIA for the adjustment of claims, "follow [. . .] loss reduction and prevention procedures," and provide MACo/JPIA with "information on the value of buildings and contents." Members may be expelled from the MACo/JPIA pool for failure to comply with loss prevention procedures or failure to provide reasonable access to all facilities and records.

¶80 With these powers in place, there is no reason to think that MACo and MACo/JPIA would be incapable of providing to Allianz an inventory of damaged property or acting to prevent further loss or damage to that property. Indeed, preparing an inventory of damaged property would appear to be essential to the exercise of MACo/JPIA's enumerated power to "provide risk management and claim adjustment." MACo/JPIA is explicitly authorized to gain access to the premises of its members and to impose loss prevention procedures, which its members are required to follow. The provisions of the policy defining the responsibilities of the insured are not inconsistent with the designation of MACo and MACo/JPIA as insured parties.

¶81 Moreover, the Court, having determined that consideration of extrinsic evidence is necessary to interpret the policy, mischaracterizes the nature of that evidence. The Court concludes that MACo and the Port are "associated or allied" because each had a relationship with Lincoln County and because the Port paid insurance premiums to MACo/JPIA. This

28

conclusion is not only inconsistent with case law defining the terms "associated or allied." It also defies common sense.

¶82    The Court states that MACo exists to represent Montana counties before the state legislature, administrative agencies, and the federal government. Opinion, ¶ 21. The Court goes on to state that the Port exists for the purpose of promoting economic development in Lincoln County. Opinion, ¶ 22. The Court then concludes that these two organizations can be considered "associated or allied" because they serve the common purpose of "promot[ing] county governmental functions." Opinion, ¶ 28. This is an unrealistically broad depiction of the purposes of MACo and the Port. MACo represents the general interests of Montana counties, not only Lincoln County. The Port, on the other hand, serves the limited purpose of promoting commerce and economic development exclusively within Lincoln County. While one does not wish to doubt the existence of collegiality among the governments of Montana counties, it is nevertheless apparent that the economic interests of a single county will not always be identical to the general interests of counties throughout the state. The facts do not support the conclusion that MACo and the Port have a common purpose.

¶83    Nor does the law support the conclusion that MACo and the Port are "associated or allied." The Court relies on *Old Colony Insurance* for the proposition that a common purpose is sufficient to establish an association or alliance, but ignores the facts of that case, which established that two entities were associated when they had entered mutual agreements and traded shares of stock in such a way that one entity was effectively placed within the control of the other. Opinion, ¶¶ 25-26; *Old Colony Ins. Co. v. Jeffery's Mill & Warehouse, Inc.*, 146 F. Supp. 277, 279-80 (N.D. Cal. 1956). *Old Colony Insurance* also

29

defined "associated" entities not simply as those possessing a common purpose, but as those "[c]losely connected or joined in a united action for a common purpose, interest, activity, objective, or the like." *Old Colony Ins. Co.*, 146 F. Supp. at 279. Undisputedly, MACo did not control the Port, and the Port did not control MACo. MACo and the Port each have a relationship with Lincoln County, but they serve distinct purposes. They are not closely connected or joined, and they are not participants in a united action.

¶84   In *Travelers Indemnity Co. v. United States*, the terms "affiliated" and "associated" were interpreted to "envision an intimate business relationship in which significant aspects of financial and managerial control of the insured and the affiliate or associate are integrated. More is required than common ownership and a limited sharing of facilities which aids each owner to pursue his independent and separate objectives." *Travelers Indem. Co. v. United States*, 543 F.2d 71, 76 (9th Cir. 1976). The Ninth Circuit then concluded that "mutuality of interest" was not sufficient to establish an association between "independent entities each pursuing separate and distinct objectives." *Travelers Indem. Co.*, 543 F.2d at 76. Here, MACo and the Port have no common ownership. MACo and the Port have no integration of financial and managerial control. Although MACo and the Port share some mutuality of interest, they are independent entities each pursuing separate objectives. The law does not support the conclusion that the Port was a "subsidiary, associated or allied company, corporation, firm, [or] organization" of MACo.

¶85   The Court also addresses the only direct relationship between MACo and the Port: the contractual relationship between MACo/JPIA and the Port. The Court suggests that by submitting an insurance application and premium payments to MACo/JPIA, the Port became

"associated or allied" with MACo. Opinion, ¶ 23. It is clear, however, that "an arm's length contractual relationship would not constitute an association or affiliation." *Travelers Indem. Co.*, 543 F.2d at 76 n. 5 (citing *In re Marine Sulphur Transp. Corp.*, 312 F. Supp. 1081, 1103 (S.D.N.Y. 1970), aff'd in part and rev'd in part on other grounds, 460 F.2d 89 (2d Cir. 1972)). The commonplace act of paying an insurance bill simply cannot be enough to establish a relationship as a "subsidiary, associated or allied company, corporation, firm, [or] organization." The Court's holding would transform ordinary consumers into corporate subsidiaries.

¶86    Having concluded that the Port is the insured party under the Allianz policy, the Court then characterizes the policy as excess insurance, to be paid directly to the Port only after it has exhausted its primary coverage. Opinion, ¶¶ 29-32. This raises the question of what primary insurance coverage, if any, the Port had. The Court notes that MACo/JPIA has conceded that it insured the Port's property. Opinion, ¶ 24. If the Allianz policy is to be applied as excess coverage, as the Court asserts, then Allianz's liability would arise only after MACo/JPIA's liability had been exhausted.

¶87    The declarations page of the policy issued by MACo/JPIA to the Port reads: "[A]uthority agrees to provide coverage as follows: . . . Real & Personal Property Blanket Replacement $100,000,000/occurrence." The second page of the policy sets out the "Limits of Liability" for the policy, and states: "Property Blanket Replacement at $100,000,000/occurrence to building/contents." The following page defines the deductible for the MACo/JPIA policy, stating that MACo/JPIA's liability "shall not be charged within the first $1,000 for any loss arising under Section[ ] I," which includes the real and personal

31

property coverage. The MACo/JPIA policy clearly indicates that MACo/JPIA is the Port's primary insurer with a liability limit of $100,000,000.

¶88    The Allianz policy provides up to $100,000,000 in coverage with a $100,000 deductible. The policy states that if the insured has primary insurance with coverage greater than $100,000, the Allianz policy will apply "only after the limits of liability of such other insurance has been exhausted." The Court does not address when Allianz's liability as an excess insurer would arise, but appears to assume that Allianz is liable for amounts in excess of the $100,000 deductible. Opinion, ¶ 29.

¶89    It is clear from the terms of the Allianz policy, however, that if the Port is insured by both MACo/JPIA and Allianz, Allianz's liability would arise only after the Port had exhausted its MACo/JPIA policy. As stated on the face of the MACo/JPIA policy and noted in the affidavit of MACo/JPIA's trust administrator, that liability limit is $100,000,000, not $100,000. In order to support its construction of the Allianz policy as excess insurance to be paid directly to the Port, the Court must either rewrite the MACo/JPIA policy to establish a liability limit of $100,000—which appears nowhere in the text of the MACo/JPIA policy— or hold MACo/JPIA solely responsible for property insurance coverage up to $100,000,000.

¶90    The liability limits established by the Allianz and MACo/JPIA policies are easily reconciled if the Allianz policy is treated as reinsurance. MACo/JPIA insures the Port for $100,000,000, charging the Port its own deductible. Allianz, in turn, insures MACo and MACo/JPIA for $100,000,000. For any loss over $100,000, the amount of the Allianz deductible, MACo/JPIA submits a claim to Allianz to cover its own liability. This

32

conclusion is not only consistent with the plain terms of both the Allianz and MACo/JPIA policies; it is also consistent with how MACo/JPIA describes its own operations.

¶91    Our statutes provide that "[a] contract may be explained by reference to the circumstances under which it was made and the matter to which it relates." Section 28-3-402, MCA. Therefore, a consideration of the MACo/JPIA insurance program is appropriate. MACo/JPIA administers a joint risk management pool for the benefit of its members, including the Port. The relationship between MACo/JPIA and the members it insures is governed by a Joint Powers Agreement which authorizes MACo/JPIA to purchase insurance coverage "to cover losses borne by the joint risk management pool," not losses borne by individual entities. It is pursuant to this authority that MACo/JPIA obtained the Allianz policy. MACo/JPIA is responsible for insuring its members up to the $100,000,000 policy limit. Claims under $100,000 are paid from the joint risk management pool. For claims that exceed $100,000, MACo/JPIA submits its own claim under the Allianz policy.

¶92    By structuring its insurance program in this way, MACo/JPIA achieves several cost-saving measures beneficial to Montana counties and other public entities. MACo/JPIA negotiates for the purchase of insurance based on the combined value of all properties in the pool, giving the pool greater leverage and bargaining power than any single purchaser. The loss history of program participants is also pooled, so that counties with numerous losses, who would otherwise pay more for insurance, are balanced out by counties with fewer losses. The loss history is further stabilized because MACo/JPIA pays all claims under $100,000 from the pool, thus reducing the number of claims that are presented to the insurer. MACo/JPIA assumes the burden of adjusting claims, ensuring that the insurer is presented

only with those claims that are meritorious. In the event of a catastrophic loss affecting multiple program participants, MACo/JPIA also allocates insurance funds fairly to each of the affected counties, rather than allowing each to make its own claim to the insurer and potentially exhaust the coverage.

¶93 The Port asserts that self-insurance pools, like MACo/JPIA, are not allowed to purchase reinsurance. This argument mischaracterizes both the plain language and the intent of § 2-9-211(1), MCA, which provides that "[p]olitical subdivisions that elect to procure insurance jointly (pooled fund) under this section may obtain excess coverage from a surplus lines insurer . . . ." There is no reason to conclude that authorization of excess coverage implicitly prohibits reinsurance coverage. The language authorizing "excess coverage from a surplus lines insurer" was added in 1995 not to specifically authorize the purchase of excess or reinsurance coverage, which was already common practice, but to permit the purchase of such coverage from insurance carriers not licensed in the state. H. Local Govt. Comm., Hearing on H. Bill 54, Jan. 5, 1995; Sen. Bus. & Ind. Comm., Hearing on H. Bill 54, Jan. 26, 1995. There is no indication in the record of any intent to prohibit reinsurance. H. Local Govt. Comm., Hearing on H. Bill 54, Jan. 5, 1995; Sen. Bus. & Indus. Comm., Hearing on H. Bill 54, Jan. 26, 1995. Discussion of earlier amendments to § 2-9-211, MCA, indicates that reinsurance was considered essential to the viability of self-insurance pools. Sen. Local Govt. Comm., Hearing on Sen. Bill 2, March 25, 1986; H. State Admin. Comm., Hearing on Sen. Bill 2, March 27, 1986. The Port's argument that reinsurance is prohibited is without merit.

34

¶94    When interpreting a contract as a whole, we must "give effect to every part if reasonably practicable," § 28-3-202, MCA, but only insofar as "it can be done without violating the intention of the parties," § 28-3-201, MCA. Particular clauses must be treated as subordinate to the contract's general intent. Section 28-3-307, MCA. The Court allows an ambiguity in the definition of personal property, not at issue in determining the coverage of the Port's real property, to subvert the general intent of the contract and, as a result, restructure MACo/JPIA's insurance program. The plain language of the Allianz policy, the definition of "associated or allied," the facts of the relationship between MACo and the Port, the terms of the MACo/JPIA policy, and the circumstances under which the Allianz policy was issued all support the conclusion that the Port was not, and was never intended to be, an insured party as defined by the Allianz policy. I respectfully dissent from the decision of this Court holding that the Port qualifies as an insured under the terms of the Allianz policy.

/S/ LAURIE McKINNON